COLORADO RIVER INDIAN TRIBES, an Indian tribe; Sierra Club, a non-profit corporation, Plaintiffs,

v.

John O. MARSH, Jr., Secretary of the Army; Lieutenant J.K. Bratton, Chief of Engineers, Corps of Engineers, United States Army; Colonel Paul W. Taylor, District Engineer, Los Angeles District of the United States Army Corps of Engineers; James Watt, Secretary of the Department of the Interior; Robert F. Burford, Director of the Bureau of Land Management; Ed Hastey, Director of the California State Office of the Bureau of Land Management; Dean Bibles, Director of the Arizona State Office of the Bureau of Land Management; Gary McVicker, Head of the Yuma District Office of the Bureau of Land Management; River City Development Co., a limited partnership, Defendants.

No. CV 82–5017–RMT(JRx).

United States District Court, C.D. California.

March 20, 1985.

Mark I. Weinberger, Alletta D'A. Belin, Shute, Mihaly & Weinberger, San Francisco, Cal., for plaintiffs.

Steven J. Bloxham, Tribal Atty., Pamela S. Williams, Associate Tribal Atty., Colorado River Indian Tribes, Parker, Ariz., for Colorado River Indian Tribes.

Laurens H. Silver, Sierra Club Legal Defense Fund, Inc., San Francisco, Cal., for Sierra Club.

Paul B. Witmer, Jr., Paul B. Witmer, Jr., Prof. Corp., Santa Ana, Cal., for defendant River City Development Co.

Alexander H. Williams, III, U.S. Atty., Frederick M. Brosio, Jr., Asst. U.S. Atty., Chief, Civil Div., Ian Fan, Asst. U.S. Atty., Los Angeles, Cal., for Federal defendants.

## MEMORANDUM AND ORDER

TAKASUGI, District Judge.

The Colorado River Indian Tribes ("Tribes") and the Sierra Club (jointly "plaintiffs") have filed a complaint for declaratory and injunctive relief and petition for writ of mandamus against the heads of a number of federal agencies (collectively "Federal Defendants"), heads of state agencies, and River City Development Co. ("Developer") (jointly "defendants"). The prayer seeks a declaration that the defendants have acted in violation of the first amendment rights of the members of the Tribes; an injunction enjoining the Army Corps of Engineers ("Corps") from issuing a permit for the placement of riprap (large boulders to stabilize shorebanks from erosion); an injunction enjoining the Developer and his agents from any construction activities; and a writ of mandamus directing the Corps to vacate the permit.

The plaintiffs essentially alleged that the construction of the River City project ("Development") and the permit for placement of riprap on the Development violate the National Environmental Policy Act of 1969 (42 U.S.C. §§ 4321 *et seq.*) ("NEPA"), the National Historic Preservation Act of 1966 (16 U.S.C. §§ 470 *et seq.*) ("NHPA"), the American Indian Religious Freedom Act (42 U.S.C. § 1996), executive orders and regulations promulgated to implement these statutes, and the first amendment to the United States Constitution.[1]

---

1. Plaintiffs seek this judicial review pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*

Any contention that plaintiffs, as organizations, lack standing to seek this equitable relief can be put to rest in the light of *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). In *Morton,* the Supreme Court recognized organizational standing where members

The pertinent background facts are as follows: The proposed Development is a 156-acre residential and commercial development proposed to be built on the west side of the Colorado River. The site of the Development is directly across the river from the Colorado River Indian Reservation and also immediately south of other portions of the reservation which lie on the west side of the river. The Development site spans Highway 95, with most of the site lying between the highway and the river. The Developer proposes to subdivide the parcel into approximately 447 lots for single-family homes, mobile homes, and commercial facilities. The land abutting the Development site on the west is owned by the United States Government and administered by the Bureau of Land Management ("BLM") of the United States Department of the Interior. The BLM land, an archeological district, includes several recorded significant cultural and archeological sites.

In connection with this proposed Development, the Developer has proposed to stabilize 4050 feet of the western shore of the Colorado River (the eastern boundary of the project site) by placing riprap along the river bank. The proposal calls for approximately two cubic yards of rock along every linear foot of the river bank. The purpose of the riprap is to stabilize the bank and to establish a permanent boundary line enabling the property to be subdivided and developed. The Developer must obtain a permit from the Corps in order to stabilize the river bank. Without bank stabilization, the approval for the development cannot be obtained from the County of Riverside.

In April, 1978, the Developer applied to the Corps for a permit to allow placement of riprap along the west river bank on the Development site. In November, 1978, the Corps prepared an environmental assessment of the permit application and concluded that because significant impact upon the environment would result from the Developer's proposed project, an environmental

impact statement ("EIS") would be prepared.

A Draft EIS was prepared and published in September 1979. On January 11, 1981, the Corps informed the Developer that the Draft EIS was "lacking only an adequate treatment of cultural resources," and stated that a "thorough cultural resources survey" of resources on and near the proposed development site was "essential" before the Corps could complete a Final EIS. The Corps proposed a detailed scope of work for a "systematic intensive cultural resources survey of lands surrounding the proposed River City Development."

In June, 1981, however, before the preparation of the survey, the Corps announced its retraction of the Draft EIS as a result of changes in Corps policy regarding its jurisdictional authority, and stated that no EIS was required.

The Corps' decision to retract the draft EIS was apparently in conformity with its proposed cultural resource regulations, 33 C.F.R. § 325, Appendix C, 45 Fed.Reg. 22112 (1980). Those regulations have never been finally adopted and incorporated into the Code of Federal Regulations.

In response to the Corps' notice retracting the Draft EIS, the Tribes wrote to the Corps noting that issuance of the requested Corps permit without preparation of an adequate EIS fully analyzing potential impact of the project on cultural and archeological resources would violate NEPA and NHPA. The Tribes also pointed out that another potentially significant effect of the project was an adverse impact upon the opposite shore of the river. On April 15, 1982, the Corps responded to the Tribes' comments, asserting that under its proposed regulations, no further evaluation or protection of cultural resources was required. Also, the Corps concluded that the riprap would cause no significant impact on the eastern side of the river. On May 21, 1982, the Corps issued a permit to the Developer authorizing it to place the riprap along the west bank of the Colorado River.

thereof were in fact threatened by defendant's acts.

The County of Riverside approved the tract maps for the project on June 19, 1984. Plaintiffs herein have challenged that action and the County's December, 1982 approval of the specific plan for the project in two separate Superior Court actions. *Colorado River Indian Tribes and Sierra Club v. County of Riverside, et al.,* Riverside County Superior Court, Indio Nos. 37230 and 41515. Both actions are pending in the trial court.

Tribes filed this complaint for injunctive and declaratory relief on September 28, 1982. On October 27, 1982, pursuant to a stipulation and order of the court, Tribes and the Developer agreed that the Developer would provide the Tribes at least 45 days' notice before beginning any construction or riprapping at River City. On May 27, 1983, pursuant to stipulation of the parties and order of the court, a First Amended Complaint was filed naming the Sierra Club as an additional plaintiff.

On August 13, 1984, the Developer formally gave plaintiffs the 45-day notice of its intent to commence riprapping activities pursuant to the Corps' permit, thus giving rise to the instant motion. Plaintiffs seek a preliminary injunction to enjoin the placement of riprap, arguing essentially that the Corps improperly issued a permit for the riprap without an EIS, in contravention of NEPA; that the Federal Defendants have failed to take the required measures to protect the cultural and archeological resources on the BLM land as mandated by NHPA; and that the balance of harm weighs heavily in favor of the Tribes.

## PRELIMINARY INJUNCTION

The traditional factors which must be present in order for preliminary injunctive relief to be granted are (1) a strong likelihood of success on the merits, (2) the possi-

bility of irreparable injury to plaintiff if the preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest. *Los Angeles Memorial Coliseum Commission v. NFL,* 634 F.2d 1197, 1200 (9th Cir. 1980); *Sierra Club v. Hathaway,* 579 F.2d 1162, 1167 (9th Cir.1978). In this circuit, two different formulations of this test have been applied. The moving party must show either (1) probable success on the merits and possible irreparable injury, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Aguirre v. Chula Vista Sanitary Serv.,* 542 F.2d 779, 781 (9th Cir.1976), quoting *Gresham v. Chambers,* 501 F.2d 687, 691 (2nd Cir.1974). See *Benda v. Grand Lodge of the Int'l Ass'n of Machinists & Aerospace Workers,* 584 F.2d 308, 315 (9th Cir.1978), *cert. dismissed,* 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979); *Wm. Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 526 F.2d 86, 88 (9th Cir.1975). These are not separate tests, but the outer reaches "of a single continuum." *Benda v. Grand Lodge,* 584 F.2d at 315. In effect, the standard provides that the more probability of success on the merits that a plaintiff establishes, the less he or she must show in the way of irreparable harm. See *Benda v. Grand Lodge, Id.*[2]

## SUCCESS ON THE MERITS

### A. NEPA

 This issue focuses upon statutory and regulatory interpretations of NEPA, which requires an EIS to be prepared for "major Federal actions significantly affecting the quality of the human environment."

---

**2.** Developer raises two equitable defenses, laches and "unclean hands," to the action for injunctive relief arguing that plaintiffs should be estopped from seeking equitable relief for not objecting to the Development when first advised; and that the propriety of the action should be questioned in light of the Tribes' own development in the area. Plaintiffs take issue

with the factual allegations that Developer raises, and presents its set of facts and interpretations. While the Developer might establish the sufficiency of these defenses at trial, the court after a careful examination of the facts presented is unable to agree with Developer's position at this stage of the proceedings.

42 U.S.C. § 4332(2)(C).[3] The standard for determining whether a project would significantly affect the quality of the human environment is whether "the plaintiff has alleged facts which, if true, show that the proposed project *may* significantly degrade some human environmental factor." *Foundation for North American Wild Sheep v. U.S. Department of Agriculture,* 681 F.2d 1172, 1178 (9th Cir.1982) (quoting *Columbia Basin Land Protection Association v. Schlesinger,* 643 F.2d 585, 597 (9th Cir.1981) (emphasis in original)). A determination that significant effects on the environment will in fact occur is not necessary. *City of Davis v. Coleman,* 521 F.2d 661, 673 (9th Cir.1975). "If substantial questions are raised whether a project may have a significant effect on the human environment, an EIS *must* be prepared." *Foundation for North American Wild Sheep,* 681 F.2d at 1178 (emphasis in original); *City and County of San Francisco v. U.S.,* 615 F.2d 498, 500 (9th Cir.1980).

Where an agency has determined that no EIS need be prepared, a court will review the reasonableness of the agency's determination. *City of Davis v. Coleman,* 521 F.2d at 673. If the court finds that the agency's conclusion that the project will have no significant adverse environmental consequences is unreasonable, it will require that an EIS be prepared in connection with the project. *Foundation for North American Wild Sheep v. U.S. Department of Agriculture,* 681 F.2d at 1178; *Portela v. Pierce,* 650 F.2d 210, 213 (9th Cir.1981); *City and County of San Francisco v. United States,* 615 F.2d 498, 500; *City of Davis v. Coleman,* 521 F.2d at 673.

Developer and Federal Defendants contend that an EIS was unnecessary because federal involvement in the project was minimal and therefore "major federal action" triggering NEPA was lacking. In support of their contention, both rely upon *Save the Bay, Inc. v. U.S. Corps. of Eng.,* 610 F.2d 322 (5th Cir.), *cert. denied,* 449 U.S. 900, 101 S.Ct. 269, 66 L.Ed.2d 130 (1980), and *Winnebago Tribe of Nebraska v. Ray,* 621 F.2d 269 (8th Cir.), *cert. denied,* 449 U.S. 836, 101 S.Ct. 110, 66 L.Ed.2d 43 (1980). These cases suggest that NEPA reaches only "major federal actions" and that the degree of federal involvement controls the scope of an agency's review of potential impact. Their holdings give independent significance to the word "major"

---

**3.** Federal defendants argue that NEPA focuses on the effects on the physical environment, such as water, air, and ecosystems; cultural impacts by themselves are insufficient to require an EIS. They rely on *Goodman Group, Inc. v. Dishroom,* 679 F.2d 182 (9th Cir.1982) wherein this Circuit held that appellant's claim that the Federal government's plan to convert the Goodman Building to low income housing would displace local artists who inhabit the Goodman Building, and thus irreparably damage the character of the area, was not in and of itself sufficient to require preparation of an EIS. Categorizing appellant's alleged harm as a "cultural threat," the Court stated that it would be doubtful that effects to the aesthetic and cultural environment, would alone, necessitate an EIS. *Id.* at 185.

Federal Defendants' assertion that the decision in *Goodman* is controlling in this case misconstrues the decision. The present case does not deal strictly with claims of future harm to the aesthetic and cultural environment. Aside from plaintiffs' claim of possible physical injury to the Tribes' riverbank from the Development, they claim that the Development threatens sites of historical and cultural significance because of influx of people that would reside and use the Development. The Court in *Goodman* recognized the distinction between the facts before the Court and the type of case before this court. After citing cases where the courts had demanded an EIS, the Court stated:

"The federal action in each of these cases either threatened the physical resources of the area, by posing significant traffic, population-concentration, or water-supply problems, or proposed the irreversible alteration of the historic attributes of rare sites."

679 F.2d at 185.

Aside from misinterpreting the case, Federal Defendants' argument overlooks the plain language of NEPA which imposes upon the Federal Government the responsibility to "preserve important *historic, cultural* and national aspects of our national heritage and maintain, whenever possible, an environment which supports diversity and variety of individual choices." 42 U.S.C. § 4331(b)(4) (emphasis added). Additionally, the regulations provide that "Effects include ecological ..., aesthetic, historical, cultural, economic, social, or health, whether direct, indirect, or cumulative." 40 C.F.R. § 1508.8.

and suggest that the degree of federal involvement is a threshold question in ascertaining the reasonableness of the federal agency's decision not to issue an EIS. This court disagrees with *Save the Bay, Inc.* and *Winnebago* insofar as their rulings stress that "major federal action" is an element that must be met to trigger NEPA and that "major federal action" has significance independent from the element of "significantly affecting the quality of the human environment" in 42 U.S.C. § 4332(2)(C).

Furthermore, conclusions reached in *Save the Bay* and *Winnebago* are in conflict with the Ninth Circuit ruling in *City of Davis v. Coleman*, 521 F.2d 661. In *City of Davis*, the Court was faced with the allegation that a federal agency had failed to prepare and file an EIS as mandated by NEPA in connection with a joint state and federal project to build a freeway interchange. The Court rejected the requirement for purposes of an EIS that the federal involvement must be "major," and instead focused its attention upon the significance of the environmental impact of the freeway interchange:

> The circuits have split on the question of whether federal action that significantly affects the environment must also be "major" in an economic or some other nonenvironmental sense to trigger the EIS requirement. We incline to the views expressed in *Minnesota Public Interest Research Group v. Butz*, 8 Cir. *in banc*, 1974, 498 F.2d 1314, 1321–22:
>
> "To separate the consideration of the magnitude of federal action from its impact on the environment does little to foster the purposes of the Act, i.e., to 'attain the widest range of beneficial uses of the environment without degradation, risk to health and safety, or other undesirable and unintended consequences.' By bifurcating the statutory language, it would be possible to speak of a 'minor federal action significantly affecting the quality of the human environment,' and to hold NEPA inapplicable to such an action. Yet if the action has a significant effect, it is the intent of

NEPA that it should be the subject of the detailed consideration mandated by NEPA; the activities of federal agencies cannot be isolated from their impact upon the environment."

(Citations omitted.)

Thus, we confine ourselves on this appeal to determining whether the defendants reasonably concluded that the Kidwell project will have no significant environmental effects.

521 F.2d at 673 n. 15.

The holding in *City of Davis* is supported by the regulations promulgated under NEPA. As defined by 40 C.F.R. § 1508.18: " '[M]ajor Federal action' includes actions with *effects that may be major* and which are potentially subject to Federal control and responsibility. Major reinforces but does not have a meaning independent of significantly (§ 1508.27) . . ." (Emphasis added.) Finally, NEPA's declaration of national environmental policy suggests a concern for the effects of development upon the environment and a commitment to restore and preserve environmental quality:

> The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of

present and future generations of Americans.

42 U.S.C. § 4331(a). To limit the scope to only "major" federal involvement, ignoring the potential for significant impact, seems incongruous to the avowed intent of NEPA to maintain environmental quality. It is not the degree of federal involvement that influences the standard of living of our society, but is instead, the potential and degree of impact from development that bears upon the overall welfare and enjoyment of our society.

■ Turning to the question of significant impact, the federal agency's decision that there will be no significant impact will not be disturbed unless the agency's decision was unreasonable. *City of Davis*, 521 F.2d at 673. This, of course, presupposes that the scope of the inquiry was proper. Should a federal agency unduly narrow the scope of inquiry in contravention to the edicts of NEPA, the test of reasonableness would be inapplicable because the factors that a federal agency should have considered and which could have affected the agency's decision, would have been improperly ignored. Had the Corps duly considered the impact and concluded that the Development's impact was not significant or too speculative, the inquiry would be circumscribed around the question of "reasonableness." The evidence presented, however, suggests that the Corps' scope of inquiry in deciding that an EIS was unnecessary, was limited to the Corps' jurisdiction, i.e., the river and its banks. This seems evident from the change in position in June, 1981. Prior to that date, the Corps had prepared an environmental assessment of the permit and concluded that because significant impacts upon the environment would result from the Developer's proposed project, an EIS would be prepared. Plaintiffs' Exhibit 8. In or about June, 1981, the Corps announced its retraction of the Draft EIS. The Corps Public Notice No. 78–112–TM (June 3, 1981) provided that

Due to the recent change in policy regarding jurisdictional authority under Sections 10 and 404, the Los Angeles District of the Corps of Engineers is retracting the EIS currently under preparation entitled Bank Stabilization near Blythe, Riverside County, California. The District has determined that the impact assessment of features outside of jurisdictional boundaries, and not physically dependent upon activities within Corps jurisdiction, is not appropriate. Therefore, the scope of the environmental assessment has been limited to the portion of the project requiring authorization (i.e. bank stabilization activities only). *Id.* at 2 (Plaintiffs' Exhibit 20).

It is evident from this statement that the Corps had not merely reassessed its previous decision, but redefined its scope, narrowing the parameters of the word "impact." Instead of assessing the possible impacts of a future development which was dependent upon the placement of riprap, it circumscribed the inquiry solely to the bank stabilization activities. Any doubt as to the change of policy by the Corps is put to rest upon examining the Corps' Public Notice which invited the public to comment on the riprap permit and its impact on cultural resources. The Corps' statement was: "[D]irect impacts from placement of riprap, and indirect impacts from haul roads and movement of equipment will have no impact on any known cultural resources." *Id.* at 3 (Plaintiffs' Exhibit 20). The failure to consider the environmental impacts outside the Corps' jurisdiction is further evidenced by its Memorandum for Record (January 19, 1982), Plaintiffs' Exhibit 21, which stated:

2. Although significant cultural resources do exist just beyond the boundary of the proposed River City Development, those sites are located outside of the jurisdictional boundary of the Corps of Engineers. River City Development Company has applied for a Department of the Army permit to stabilize its property boundary along the Colorado River.

3. An environmental assessment of the proposed bank stabilization project disclosed that no significant impacts upon the human environment are expected as a result. Therefore, no Environmental

Impact Statement (EIS) is being prepared. A review of the comments received during the comment period failed to produce any new information which indicate that an EIS should be prepared.[4]

■ In limiting the scope of its inquiry, the Corps acted improperly and contrary to the mandates of NEPA. The Corps' decision to assess only those impacts physically dependent upon activities within its redefined jurisdiction, i.e., the river and its immediate banks, was tantamount to limiting its assessment to primary impacts. The Corps proceeded to assess the project with tunnel vision. In *City of Davis*, the Ninth Circuit strongly stressed that direct, indirect (secondary) and cumulative impacts of proposed major federal action must be assessed. 521 F.2d at 676–77. The regulations promulgated under NEPA fortify such an approach. 40 CFR § 1508.8 defines effects as:

(a) Direct effects, which are caused by the action and occur at the same time and place.

(b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. *Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.* Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both bene-

ficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial. (Emphasis added.)

Furthermore, 40 C.F.R. § 1508.7 defines cumulative impact as:

... the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

It is within these guidelines that the Corps should have attempted to assess the consequences of the issuance of the permit. The Corps should have analyzed the indirect effects of the bank stabilization on both "on site" and "off site" locations, i.e., the growth-inducing effects related to the changes in the pattern of land use and population growth. It would appear that the Corps failed to consider the cumulative impact associated with the bank stabilization project when it may have been reasonably foreseeable that the placement of the ripraps was just a stepping stone to major development in the area.

The indirect impact of a project and the cumulative effects thereof are equally as important as the direct or primary effects of the proposed action. The Federal Defendants are in error when they contend that because there was minimal federal involvement, there was no need to examine each and every effect, direct or indirect, "on site" or "off site."

Impact statements usually analyze the initial or primary effects of a project, but they very often ignore the secondary or induced effects. A new highway located in a rural area may directly cause in-

---

**4.** In a letter from the Corps to the Tribe (April 15, 1982), Plaintiffs' Exhibit 6, there is language that the impact from the Development are speculative, which suggests that this was truly considered. However, any claim by the Corps that the Development's impact was considered is at odds with its avowed change in policy to only

ascertain the impact of the bank stabilization activities. Additionally, it would not account for its prior position before the policy change in June, 1981, wherein it held that there would be a significant impact on the environment as a result of the proposed Development.

creased air pollution as a primary effect. But the highway may also induce residential and industrial growth, which may in turn create substantial pressures on available water supplies, sewage treatment facilities, and so forth. For many projects, these secondary or induced effects may be more significant than the project's primary effects.

\* \* \* \* \* \*

While the analysis of secondary effects is often more difficult than defining the first-order physical effects, it is also indispensable. If impact statements are to be useful, they must address the major environmental problems likely to be created by a project. Statements that do not address themselves to these major problems are increasingly likely to be viewed as inadequate. As experience is gained in defining and understanding these secondary effects, new methodologies are likely to develop for forecasting them, and the usefulness of impact statements will increase. *Fifth Annual Report of the Council on Environmental Quality*, 410–11 (December 1974).

*City of Davis*, 521 F.2d at 676–77.

■ Defendants contend that the indirect effects of harm to archeological and historical resources caused by the Development are too speculative to consider as potential impacts of the granting of the permit.[5] While effects which are not reasonably foreseeable may be disregarded, an agency should not attempt to travel the easy path and hastily label the impact of the Development as too speculative and not worthy of agency review. The purpose of an EIS is to evaluate the possibilities regarding a project in light of current and future plans and contingencies in order to produce an informed estimate of the environmental consequences.

It must be remembered that the basic thrust of an agency's responsibilities under NEPA is to predict the environmental effects of proposed action before the action is taken and those effects fully known. Reasonable forecasting and speculation is thus implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as "crystal ball inquiry."

*City of Davis*, 521 F.2d at 676 citing, *Scientists' Institute for Public Information v. A.E.C.*, 481 F.2d 1079, 1092 (D.C.Cir. 1973). This court finds that the defendants' position regarding the speculative nature of the effects of the Development may be untenable given the grave concerns which the Corps expressed in the Draft EIS. In light of the holding that the Corps impermissibly narrowed the scope of their responsibility under NEPA, the question of whether the indirect effects of the Development and its impact are "reasonably foreseeable" need not be addressed.

## B. NHPA

NHPA requires all federal agencies to examine the effects of their actions on property included in or eligible for inclusion in the National Register of Historic Places. 16 U.S.C. § 470f; 36 C.F.R. § 800.4.[6] Ex-

---

5. Additionally, because of unprecedented flooding in 1983 which caused extensive erosion of Developer's property, Developer claims that pursuant to 33 C.F.R. § 323.4, it is exempted from the permit requirement. Developer's reliance upon 33 C.F.R. § 323.4 is misguided. Section 323 deals with "Permits for discharges of dredged or fill material into waters of the United States," and section 323.4, upon which Developer relies, deals with certain discharges that are exempt from a permit requirement. This case, of course, does not deal with discharges. The permit in question is for a structure, i.e., riprap, in or affecting navigable waters of the United States, which is covered in 33 C.F.R. § 322. Even assuming that section 323 were

applicable, 33 C.F.R. § 323.4(a)(iii)(E)(2) exemptions are limited discharges caused by emergency *reconstruction of currently serviceable structures*. The present case does not involve reconstruction of a previously installed man-made structure.

6. Developer argues that NHPA is inapplicable because NHPA has no or very limited application to agency permits for a private project. Developer's assertion is in error for it overlooks or ignores the definition of the word "undertaking" for purposes of NHPA, 36 C.F.R. § 800.2(c), which includes non-Federal action carried out pursuant to a permit.

ecutive Order 11593, 36 Fed.Reg. 8921 (May 13, 1971) buttresses the responsibilities of federal agencies under NHPA. Section 2 of the order requires federal agencies, no later than July 1, 1973, to locate, inventory and nominate properties under their jurisdiction to the National Register. Under NHPA and Executive Order 11593, the federal agency must exercise caution to assure the physical integrity of those properties that appear to qualify for inclusion on the National Register. 16 U.S.C. § 470h–2(a)(2).

Regulations implementing NHPA and Executive Order 11593 have been adopted by the Advisory Council. The general procedure set forth in the regulations requires an agency as early as possible, and in any event before taking any action that would foreclose the Advisory Council's opportunity to comment, to identify any National Register or eligible property located within the area of the undertaking's potential environmental impact which may be affected by the undertaking. 36 C.F.R. § 800.4. "Area of the undertaking's potential environmental impact" is defined as "that geographical area within which direct and indirect effects generated by the undertaking could reasonably be expected to occur and thus cause a change in the historical, architectural, archeological, or cultural qualities possessed by a National Register or eligible property." 36 C.F.R. § 800.2(o). The determination of the boundaries of that area should be made by the agency official in consultation with the State Historic Preservation Officer ("SHPO") as early as possible. Id. "Eligible property" means property that meets the National Register criteria set forth in 36 C.F.R. § 60.4. The agency, in consultation with SHPO must apply the criteria to "all properties that may possess any historical, architectural, archeological, or cultural value located within the area of the undertaking's potential environmental impact." 36 C.F.R. § 800.4.

The agency must then determine the effect of a proposed undertaking on any National Register or eligible property. An "effect" occurs (1) "whenever any condition of the undertaking causes or may cause any change, beneficial or adverse, in the quality of the historical, architectural, archeological, or cultural characteristics that qualify the property to meet the criteria of the National Register," or (2) when an undertaking "changes the integrity of location, design, setting, materials, workmanship, feeling, or association of the property" that contributes to its historic significance. 36 C.F.R. § 800.3(a) and (b). An effect may be either direct or indirect. Indirect effects include "changes in the pattern of land use, population density or growth rate that may affect on properties of historical, architectural, archeological, or cultural significance." Id.

Where an effect is found, the agency, in consultation with the SHPO, must then determine whether the effect would be adverse, applying the criteria of adverse effect, which include:

(1) Destruction or alteration of all or part of a property;

(2) Isolation from or alteration of the property's surrounding environment;

(3) Introduction of visual, audible, or atmospheric elements that are out of character with the property or alter its setting . . . .

36 C.F.R. § 800.3(b). If a determination of no adverse effect is made by both the agency and the SHPO, the agency must send adequate documentation of such determination to the Executive Director of the Advisory Council. 36 C.F.R. § 800.4(c).

If the agency or the Executive Director finds an adverse effect, the agency must (1) prepare a Preliminary Case Report requesting the comments of the Council, (2) notify the SHPO of this request, and (3) undertake the consultation process set forth in section 800.6. Until the Council issues its comments pursuant to section 800.6, the agency is precluded "from taking or sanctioning any action or making any irreversible or irretrievable commitment that could result in an adverse effect on a National Register or eligible property or that would foreclose the consideration of

modifications of alternatives to the proposed undertaking that could avoid, mitigate, or minimize such adverse effects." 36 C.F.R. § 800.4(d).

Under the consultation process set forth in section 800.6, the agency, SHPO, and the Executive Director of the Advisory Council are the consulting parties who must "consider feasible and prudent alternatives to the undertaking that could avoid, mitigate, or minimize adverse effects on a National Register or eligible property." *Id.* The consulting parties must execute a Memorandum of Agreement either specifying how the adverse effects will be avoided or mitigated, or acknowledging that they cannot be avoided or mitigated and specifying any recording, salvage, or other measures to minimize the adverse effects that shall be taken before the undertaking proceeds. *Id.* The Memorandum is then reviewed by the Council. It constitutes the comments of the Council and satisfies the agency's responsibilities under section 106 of the NHPA, section 2(b) of the Executive Order, and the regulations 36 C.F.R. §§ 800, *et seq.*

Federal Defendants and Developer assert that NHPA has not been violated. They argue that the Corps considered the "area of the undertaking's potential environmental impact" and found the possible effects of the riprap claimed by the Tribe to be speculative. They contend that the Corps, accordingly, was under no obligation to initiate the consultation process.

Examination of the documents presented to this court suggests the Corps relied upon 33 C.F.R. § 325, Appendix C, 45 Fed. Reg. 22112 (1980) in fulfilling its perceived duties pursuant to NHPA. Those regulations have never finally been adopted and incorporated into the Code of Federal Regulations.

Under those proposed regulations, the Corps apparently redefined the scope of its responsibilities to properties dependent upon the likelihood of inclusion in the National Register. In other words, with respect to properties listed in or determined eligible for inclusion in the National Register, the Corps' scope of responsibility dealt with the direct and indirect reasonably foreseeable effects on such properties by reason of the proposed riprapping (the "affected area"). For properties which *may* qualify for inclusion, the Corps' responsibility was further limited to the waters or uplands directly affected by the riprap permit (the "permit area"). Following these guidelines, the Corps, in a letter to the Tribes, stated that they had not identified any cultural resources in the "permit area" and that the probability of any impact on any archeological resource was speculative and, therefore, these archeological resources were not within the "affected area." [7]

---

7. The letter states
"The Corps responsibility for the protection of cultural resources is limited under 33 CFR 325 Appendix C, to the 'affected area' for properties which have been listed in or determined eligible for inclusion in the National Register of Historic Places; and to the 'permit area' for identification of properties which may qualify for inclusion in the National Register.
The 'permit area' is defined as 'those areas comprising the waters of U.S. that will be physically affected by the proposed work or structures, or uplands directly affected as a result of authorizing the work or structures'. The 'permit area' has been surveyed for the presence of cultural resources and was found to contain no such properties.
The 'affected area' is defined as '... that geographical area within which direct and indi-

rect effects of the proposed work or structures, if permitted, could reasonably be expected to occur'. There is no evidence to indicate the probability that impacts on archeological resources on adjacent Federal lands would be induced by the River City subdivision (construction of which is contingent upon Corps-permitted bank stabilization). The prediction of such impacts is speculative and therefore does not qualify these resources for inclusion in the 'affected area'. I have had a hydraulics evaluation of the placement of riprap on the west side of the Colorado River. The determination is that there should be no significant increase in bank erosion on the east side of the Colorado River ..."
(Plaintiff's Exhibit 6)

These regulations upon which the Corps relied, however, have never been finally adopted and incorporated into the Code of Federal Regulations. While a federal agency can choose to adopt counterpart regulations related to its own specific programs and authorities, 36 C.F.R. § 800.11, to do so, the counterpart must be approved by the chairperson of the Advisory Council, 36 C.F.R. § 800.11(a), a fact which is lacking with respect to the proposed regulation upon which the Corps relied.

Reliance by the Corps on regulations lacking any force or substance does not necessarily lead to the conclusion that the Corps breached its duty under NHPA. If the responsibilities under the unadopted regulations were commensurate with the responsibilities under NHPA and its regulations, any agency decision in accordance therewith would be given due weight and deference.

The regulations upon which the Corps relied, 33 C.F.R. § 325, Appendix C, 45 Fed.Reg. 22112 (1980) distinguishes between different types of property and affixes differing responsibilities to each.

Under the unadopted regulations, the Corps' responsibility to protect properties that may qualify for inclusion in the National Register was limited to the "permit area," while the Corps' responsibility to protect properties that have been listed in or determined eligible for inclusion in the National Register by the Secretary of Interior extended to the "affected area." By definition, the "affected area," which includes that area where both direct and indirect effects of the proposed work or structure could reasonably be expected to occur, encompasses a larger area than the "permit area," which includes only the water and uplands directly affected. Properties that may qualify for inclusion are treated differently from properties listed in or determined eligible for the National Register. Under a literal reading of the unadopted regulations, the Corps would not be responsible for a property that was of immense archeological and historical significance and was within the "affected area" but outside the "permit area," if that property was not listed in or determined eligible for the National Register.

The distinction between properties and differing scopes of responsibility is at odds with NHPA and its regulation. 16 U.S.C. § 470f provides that the federal agency shall "take into account the effect of the undertaking on any district, site, building, structure, or object that is *included in or eligible* for inclusion in the National Register." (Emphasis added.) The definition of "eligible property" makes no distinction between determined eligible and property that may qualify:

> "Eligible property" means any district, site, building, structure, or object that meets the National Register Criteria. 36 C.F.R. § 800.2(f).

What is an eligible property for purposes of NHPA turns upon the inherent historical and cultural significance of the property and not opinion of its worth by the Secretary of Interior. Under NHPA, properties that are a part of the rich heritage of our nation are afforded the same guarantees of protection afforded properties already determined eligible.

██ Any doubt to whether "eligible property" includes those properties that may qualify for inclusion is dispelled upon examination of the definition prior to 1979. Before that date, "property eligible for inclusion in the National Register" was defined as "any district, site, building, structure, or object which the Secretary of the Interior determines is likely to meet the National Register Criteria." 36 C.F.R. § 800.3(f) (1978). In 1979, the definition for "eligible property" was modified, eliminating reference to the Secretary of Interior's determination, and instead protecting all property that met the National Register Criteria.

Additional support for the conclusion that "eligible property" is not limited to those properties determined eligible for the National Register, arises from 16 U.S.C. § 470, (NHPA), in which Congress spells out its finding and declaration of policy and the regulations promulgated pursuant to

NHPA. The regulations spell out what an agency must do when a property that may qualify for inclusion in the National Register is within the area of the undertaking's potential environmental impact:

The Agency Official, in consultation with the State Historic Preservation Officer, shall apply the National Register criteria to all properties that may possess any historical, architectural, archeological, or cultural value located within the area of the undertaking's potential environmental impact. If either the Agency Official or the State Historic Preservation Officer finds that a property meets the National Register Criteria or a question exists as to whether a property meets the Criteria, the Agency Official shall request a determination of eligibility from the Secretary of the Interior in accordance with 36 CFR Part 63. The opinion of the Secretary respecting the eligibility of a property shall be conclusive for the purposes of these regulations. If the Agency Official and the State Historic Preservation Officer agree that no identified property meets the Criteria, the Agency Official shall document this finding and, unless the Secretary has otherwise made a determination of eligibility under 36 CFR Part 63, may proceed with the undertaking. 36 C.F.R. § 800.4(a)(3).

The responsibilities incumbent upon the federal agencies imposed by NHPA and its regulations aid in the preservation and maintenance of the historical and cultural integrity of *all* properties that meet National Register Criteria. The importance and significance of the property are a reflection of its interest to the general public and scientific community. The value is not enhanced because it is in the National Register or determined eligible for inclusion in the National Register by the Secretary of Interior. Hence, to suggest, as the proposed regulations attempted to do, that properties of equal importance and significance, should be afforded varying degrees of protection, eludes basic logic and reasoning. Society's concern to preserve and maintain historic and cultural resources that enrich this nation and enhance our national heritage, which was the driving force behind the enactment of NHPA, should be extended to all significant cultural resources regardless of whether the property was "officially recognized."

■ The Corps' action in accordance with and in reliance on the proposed regulations violated NHPA and its regulations. Pursuant to the proposed regulations and mirrored in the Corps' letter to the Tribes (see footnote 7), the Corps looked at the effects on properties that may qualify for inclusion in the National Register solely within the "permit area," as that area is defined in the proposed regulations and failed to look at the effects on like properties in the broader "affected area." While the conclusion by the Corps that the effect of the riprap on cultural resources are speculative may ultimately be proper, it is not proper here where eligible property within the affected area has not even been considered.[8] Accordingly, the Corps breached its responsibility under NHPA.[9]

---

**8.** In the Corps Memorandum for the Record (January 19, 1982), Plaintiffs' Exhibit 21, there is language to the effect that both the "permit area" and the "affected area" were surveyed for the presence of cultural resources by the Corps. However, the language must be read in context with the next sentence which reads, "Therefore the statement in the Environmental Assessment that the proposed action would not affect any National Register property is valid and correct." The last sentence supports the conclusion that, if the Corps did a survey on the "affected area," it was limited to existing or eligible National Register property and not to property which might qualify for inclusion in the National Register. The ill-defined scope and inadequacy of the survey is brought to bear in light of recent discoveries of sites of potential historic and cultural significance on the Development itself, see footnote 9.

**9.** It is interesting to note that after the Corps retracted the EIS, evidence of additional sites of possible archeological and cultural significance were located on Development site to the west of Highway 95. The Developer's own consultant, Jay von Werlhof, seems to suggest that one of the sites, a ceremonial site, is of historical significance. Subsequently, and in an apparent response to the discoveries, Developer amended the tract maps to eliminate the residential devel-

IRREPARABLE INJURY

As noted earlier, the standard to be met in obtaining a preliminary injunction is the showing of

(1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if the preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases). [Citations.] In this circuit, the moving party may meet its burden by demonstrating either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips sharply in its favor. [Citation.] These are not separate tests, but the outer reaches "of a single continuum." [Citation.]

*Los Angeles Memorial Coliseum Commission v. NFL,* 634 F.2d at 1200–1201.

■ When dealing with NEPA violations, this Circuit appears to take a decidedly different approach. It has applied more liberal standards upon a showing of likelihood of success on the merits by the party seeking the enforcement of NEPA. *See American Motorcyclist Ass'n v. Watt,* 714 F.2d 962, 965–966 (9th Cir.1983); *Warm Springs Dam Task Force v. Gribble,* 565 F.2d 549, 552 n. 2 (9th Cir.1977). Instead of imposing an affirmative responsibility upon the plaintiff to show harm or injury, irreparable damage may be implied from the failure of responsible authorities to evaluate thoroughly the environmental impact of a proposed federal action. *Friends of the Earth, Inc. v. Coleman,* 518 F.2d 323, 330 (9th Cir.1975); *American Motorcyclist Ass'n v. Watt,* 714 F.2d at 966. Once a substantial NEPA violation has been shown, an injunction should issue without detailed consideration of traditional equity principles, because the injunction in aid of NEPA enforcement is the execution of a congressional policy mandate. *California v. Bergland,* 483 F.Supp. 465, 498 (E.D.Cal.1980), *mod. sub nom. California v. Block,* 690 F.2d 753 (9th Cir.1982); *See also Lathan v. Volpe,* 455 F.2d 1111, 1116 (9th Cir.1971); Grad's *Treatise on Environmental Law,* Vol. 2, § 9.04[2][b].[10]

The rationale for this NEPA injunction rule is clear. NEPA represents a declared Congressional policy requiring assessment of environmental concerns. As such, Congress has weighed the equities and determined that failure to examine environmental issues represents irreparable injury. If having established a violation of NEPA, plaintiffs are not allowed to enjoin further activities until the agency complies with NEPA, then NEPA would be an "exercise in futility."

*California v. Bergland,* 483 F.Supp. at 498–499. (Citations omitted.) The purpose of enjoining government action pending preparation of the environmental impact statement is, generally, to maintain the status quo while additional environmental data is obtained, in order to preserve the decision makers' opportunity to choose

opment proposed for the west side of the highway. Also, the County of Riverside required that a fence be constructed along the west side of the ceremonial site evaluated by von Werlhof.

Federal Defendants state that these recent discoveries should have no bearing upon the issues before the court as they were discovered only after the decision to retract the EIS was made. This statement is totally without merit, for the discovery of historic and cultural sites on the Development site directly bears upon the adequacy of the Corps' survey and the reasonableness of its decision. The court cannot allow an agency to "benefit" by its own inadequate environmental survey.

**10.** In "unusual circumstances," the court must balance the equities, despite a finding of a NEPA violation. *See American Motorcyclist Ass'n v. Watt,* 714 F.2d 962, 966 (9th Cir.1983); *Forelaws on Board v. Johnson,* 743 F.2d 677, 685 (9th Cir.1984), *modified* (9th Cir. Jan. 21, 1985). *See also,* Grad's *Treatise on Environmental Law,* Vol. 2, § 9.04[2][b]. Additionally, irreparable damages will not be implied in an action to enforce NEPA if movant shows little likelihood of prevailing on their claim. *Friends of the Earth, Inc. v. Coleman,* 518 F.2d 323, 330 (9th Cir.1975). These limitations, however, are inapplicable to the present case. Plaintiffs have established a likelihood of success and there are none of the "unusual circumstances" which prompted the courts in the cases cited above, to compel a different holding.

among policy alternatives. *Forelaws on Board v. Johnson,* 743 F.2d 677, 685 (9th Cir.1984), *modified,* (9th Cir. Jan. 21, 1985).[11]

 Even assuming that the question of irreparable injury must be considered, the conclusion herein that a preliminary injunction should issue would remain unchanged.

Plaintiffs in this case, having established probable success on the merits (i.e., that NEPA and NHPA have been violated), would only need to show the possibility of irreparable injury under the traditional standard. That irreparable injury must be causally connected to the violation of NEPA and/or NHPA. In the case of both NEPA and NHPA, that violation is, essentially, the failure of the Federal defendants to consider the reasonable foreseeability of the Development upon the granting of the riprap permit and the potential harm that the Development poses to the historical and archeological sites. The granting of the permit without such consideration forecloses the taking of any steps to alleviate potential harm.

The evidence submitted regarding the historical and archeological sites on or near the proposed Development, in the form of letters, studies, evaluations, and declarations, unquestionably suggests the importance of at least some of these sites. The importance of these sites transcends their spiritual value to the Tribes and, instead, evidences their cultural significance to the general public. While there seems to be some dispute as to the degree of impact that the Development poses, there seems to be a general consensus among the parties that the Development will necessarily exert pressures that threaten the integrity of the cultural and archeological resources. The frailty of the resources and the fact that the Development would increase the number of "off-road-vehicles," which represents the greatest threat to these resources, suggest, at a minimum, the possibility of irreparable harm. The court is also mindful of the advancement of the public interest in preserving these resources. They represent a means by which to better understand the history and culture of the American Indians in the past, and hopefully to provide some insight and understanding of the present day American Indians.

Defendants urge this court to consider only the direct impact of the riprap, limiting inquiry of the effects of the riprap to the river and its banks. However, defendants' focus is misdirected. The injury that must be focused upon in a motion for preliminary injunction must be the injury that is threatened by the defendant's improper conduct. In this case the improper conduct, the violation of NEPA and NHPA, poses a possibility of irreparable injury to the historical and archeological sites. This court does not pass on the reasonableness of the Corps' finding that impact on the opposite riverbank is insignificant. As such, any impact on the riverbanks is not within the scope for which irreparable injury should be measured.

While this court is mindful that one of the reasons Developer seeks to riprap the bank is to mitigate further river erosion,[12] and that the Developer must, in addition to the riprap permit, seek the two additional permits from federal agencies, it cannot ignore the fact that the primary reason the Developer sought a federal permit for the riprap was that said riprap was required by

11. While the holdings of the cases cited so far dealt with NEPA, the guidelines expounded would also be applicable to NHPA, since the rationale underlying the relaxation of the traditional standards for a preliminary injunction for NEPA violations would seem to have the same force and substance for NHPA violations.

12. Developer states that it has a common law right to protect its property from erosion by flooding, relying upon *Beach Colony II v. California Coastal Com.,* 151 Cal.App.3d 1107, 199 Cal.Rptr. 195 (1984) as authority. The decision is clearly inapposite as the case dealt with California statutory and common law interpretation. Additionally, the decision did not hold that the concept of "self-help" was absolute, but was, instead, subject to reasonable conditions imposed by agencies with regulatory jurisdiction over the area. *Id.* at 1118, 199 Cal.Rptr. 195.

the County as a pre-condition to the development of the land. To then say that the Development is not a reasonably forseeable event, and therefore its impact should not be considered because Developer has other reasons in seeking to riprap the bank or that other permits are necessary before development begins, overlooks the primary motivating force behind the application for the permit. This court is of the opinion that irreparable harm to the cultural and archeological resources as a result of the Development is possible.

As such, under either the traditional or the NEPA standard, this court finds that plaintiffs are entitled to a preliminary injunction.[13] IT IS SO ORDERED.

---

**13.** In reaching this conclusion as to the issue of irreparable harm, this court is painfully aware of the damage in terms of lost acreage suffered by the Developer in 1983 due to the unprecedented release of water into the Colorado River and is sympathetic to Developer's legitimate desire to develop his land. Nevertheless, plaintiffs have been successful in showing the required possibility of irreparable harm.