[Civ. No. 28968. Fourth Dist., Div. One. Feb. 16, 1984.]

BEACH COLONY II, Plaintiff and Respondent, v.
CALIFORNIA COASTAL COMMISSION, Defendant and Appellant.

COUNSEL

John K. Van de Kamp, Attorney General, N. Gregory Taylor, Assistant Attorney General, and Anthony M. Summers, Deputy Attorney General, for Defendant and Appellant.

Latham & Watkins, David L. Mulliken and Christopher W. Garrett for Plaintiff and Respondent.

Krauel & Krauel and Robert Krauel as Amici Curiae on behalf of Plaintiff and Respondent.

OPINION

**WORK, J.**—Today we hold owners of dry lands, which border on environmentally sensitive bodies of water (or wetlands) within the California Coast-

al Zone, may restore their property to its original contours after its lands have been violently torn or washed away. Further, that encroaching waters, which overflow and cover that previously dry land solely because of the physical damage caused by the violent event, do not automatically transform the lands encroached upon into a protected marine resource, "wetland," as defined in the California Coastal Act of 1976.[1]

In reaching this result we determine the common law rights of property owners to reclaim lands eroded through avulsion has not been preempted by statute, and is not inconsistent with the policies underlying the act, although reclamation activities which adversely impact protected environmentally sensitive areas are subject to reasonable mitigating conditions which may be imposed by the California Coastal Commission (Commission).

Thus, we affirm an order of the trial court striking a special condition imposed on a reclaiming property owner because it is unreasonably premised on the commission's unsupported finding that there was no right to rebuild a landmass lost through avulsion once the eroded areas became covered by waters from an adjoining lagoon.

### Factual and Procedural Background

The Commission appeals a writ of administrative mandate (Code Civ. Proc., § 1094.5) ordering it to strike one of the special conditions imposed when it issued a permit allowing Beach Colony II (Colony) to construct a barrier to protect its property from encroaching waters from the San Dieguito Lagoon. The revetment will also benefit adjoining landowners and the City of Del Mar. The objectionable condition (Condition One) permits the project only upon a showing the proposed retaining wall will not decrease the net area of *submerged wetlands* existing on December 19, 1980. While the condition allows Colony to dredge to any depth necessary to stabilize the barrier and to intrude into the lagoon where necessary to properly align the barrier, it requires Colony to create new submerged wetland areas by dredging landward from the "existing alignment of the riverbank and temporary revetment." Thus Colony may not restore its own avulsed property unless it carves away its adjacent dry land to create the "new submerged wetland areas."

The San Dieguito Lagoon is one of 19 wetland areas specifically identified for preservation to maintain ecological balances.[2] As of December 19,

---

[1]Public Resources Code section 30000 et seq.
All statutory references are to the Public Resources Code unless otherwise specified.
[2]Section 30233, subdivision (c).

1980, a strip of Colony's property next to the San Dieguito Lagoon was submerged under six inches of water. The underwater portion intruded into Colony's property distances ranging 17 feet to 28 feet, inundating more than 1/2 acre of Colony's total 2-1/2-acre tract II.

For an indeterminate time before February 1980 (at least nine years), this now submerged strip was a solid landmass similar in nature to the rest of the parcel. Although Colony's tract is next to lands (some developed) lying below the 100-year flood plain (and some even below the 20-year flood plain), the overwhelming, if not uncontradicted, evidence shows tract II, as it existed immediately before February 1980, was entirely above the 100-year flood plain.

Colony previously had improved this parcel by leveling, etc., to allow eventual construction of condominium units, and had constructed several units on its adjacent tract I, also lying above the 100-year flood plain. Colony's application for a permit to develop tract II in 1976 was denied because its proposal did not include installation of a protective revetment.

In February 1980, flood waters poured down from surrounding hills and dams through the San Dieguito River where, in natural course, they would flow to the sea. However, debris (trees, etc.) jammed against pilings of railroad and highway bridges diverted the raging waters from their natural course, directing them against the outer bank of tract II, washing it away.[3] At the same time, the flooding inundated a lower 70-acre parcel within the adjacent flood plains. Flooded homeowners living within the adjacent 70 acres promptly "reclaimed" their submerged properties by pumping the water back into the lagoon, over existing retainers. Colony, of course, could not do this since its landmass was gone and no sea wall remained.

After the 1980 flooding, Colony submitted a new proposal to build 10 condominium units (with mother-in-law attached units) to be situated in 5 buildings. It proposed to build a substantial retaining wall generally parallel to, and entirely within, its property line. The dike would reclaim most, but not all, of its flooded property. Colony proposed to fill the inundated portion of its property *behind* the revetment to accommodate its project and to allow a 50-foot public access between the revetment and its property development. That portion of its property lying between the revetment and the lagoon boundaries as delineated immediately before the February 1980 flood are to be deeded to the state.

---

[3]The Commission describes the 1980 action which washed away a portion of Colony's tract II as the "1980 *avulsive* event."

For various reasons, the City of Del Mar, the adjacent property owners lying within the flood plains, and Colony preferred to have the revetment extend beyond Colony's property to protect adjacent low-lying areas from future floods, to prevent debris buildup at the bridges, to enhance Del Mar's own lagoon enhancement plans and to ease the city's housing needs. This extended construction intruding into the lagoon requires dredging and filling.

### Our Standard of Review

In setting forth its findings, the superior court stated it exercised independent judgment and found no substantial evidence to support the Commission's finding the avulsed area acquired the protected "wetland" status of the encroaching lagoon. The Commission states this shows the trial court applied the independent judgment test, rather than a substantial evidence standard, in its review. While we believe the trial court actually used the substantial evidence test urged by the Commission, we have independently reviewed the lengthy administrative record and base our findings and conclusions on our research. (*Aries Dev. Co. v. California Coastal Zone Conservation Com.* (1975) 48 Cal.App.3d 534, 545 [122 Cal.Rptr. 315].)

COLONY'S FLOODED PARCEL DID NOT BECOME A PROTECTED MARINE RESOURCE SOLELY BECAUSE ITS PROTECTIVE BANK WAS WASHED AWAY

Section 30121 defines "wetland" as any land within the coastal zone covered periodically or permanently with shallow water. From and after February 1980, the eroded portion of tract II has been constantly under approximately six inches of water. Therefore, technically, the land was within the statutory definition when the Commission acted, and the Commission so found. This finding is the sole basis for imposing special Condition One.

■ The trial court determined the Commission erred when it declared the avulsive action of the diverted river channel transformed Colony's property into a *protected* "wetland." We agree with the trial court's finding there is no substantial evidence to support the Commission's finding.[4]

---

[4]The trial court also found Colony had a legal right to reclaim its land lost through avulsion, and the conditions preventing Colony from filling the avulsed land areas deprives it of a vested property interest and constitutes an unlawful taking requiring just compensation according to the Fifth Amendment of the United States Constitution. Because we find the trial court correctly found there is no substantial evidence to support the Commission's finding Colony's property to be a "wetland" as defined in the coastal act, we do not reach the constitutional issue.

Although the statutory definition relies upon the land being covered with water either periodically or permanently, the Commission has expanded the meaning of "wetlands" to include those lands where "saturation with water is a dominant factor in determining the nature of the soil development and the types of plant and animal communities living in the soil and on its surface." (See appendix D to Statewide Interpretive Guideline for Wetlands and Other Wet Environmentally Sensitive Habitat Areas, adopted Feb. 4, 1981, by the Cal. Coastal Com.) Thus, the Commission recognized the presence or absence of hydrophites and hydric soils are the most useful, but not exclusive, criteria to determine whether a particular parcel is a "wetland." However, there is no evidence the parcel damaged in the 1980 flood was a "wetland" by *any* definition *before* avulsion.

The Commission emphasizes this court has twice supported its interpretation of "wetland" policies of the coastal act, once in a case involving an adjoining lagoon (*City of San Diego* v. *California Coastal Com.* (1981) 119 Cal.App.3d 228 [174 Cal.Rptr. 5], Los Penasquitos Lagoon), recognizing the importance and scope of these policies to preserve important, sensitive environments. No one disputes this; the thrust of Colony's argument, and the key to our decision, is that the area sought to be developed within the boundary of Colony's property is not a protected "wetland."

In *City of Chula Vista* v. *Superior Court* (*Cal. Coastal Com.*) (1982) 133 Cal.App.3d 472 [183 Cal.Rptr. 909], we recognized the Commission's power and responsibility to control developmental activities is not limited to developments on property specifically defined for protection by statute. We held the Commission could deny a developmental permit where the development would impact nearby areas worthy of special attention. (*Id.,* at pp. 490-491.) However, here, special Condition One requiring Colony to turn a portion of its still, dry-land area into a "wetland" in order to compensate for "reclaiming" its avulsed land is based only on the Commission's perception that Colony's reclamation would decrease a portion of a protected "wetland" area, not as a reasonable quid pro quo for developmental impacts upon the lagoon area beyond Colony's boundaries. It can be supported only if the avulsed area within Colony's boundary is in fact a protected "wetland."

The Commission argues: the area has been under water for the last three years (now four); it forms a part of an historic wetland area and wetland systems are, by their very nature, dynamic.

*Was the area part of a dynamic system?* The Commission states Colony must bear the consequences of owning property subject to the dynamics of a wetland system. The Commission contends the area in which the property

lay was subject to natural changes including that the river would change course. It claims the new channel created by the 1980 flooding was part of the natural dynamics of the entire wetland system, allowing the San Dieguito Lagoon waters to flow over and cover, at least since 1980, a portion of the Colony tract.

However, the evidence shows the "dynamics" diverting the river channel and directly causing the washing away of a portion of its property were not natural; it would not have occurred except for the interference of certain man-made structures (bridge pilings) preventing normal flotsam and jetsam pushed ahead by the flood waters from following the natural course and either going out to sea or being distributed over lands within the normal flood plain. There is no evidence to show this property would have been impacted by natural water "dynamics" less than, or even equal to, those generated by a 100-year flood.

*Is the property in question a part of a "wetland" system in which periodic changes can be expected?* The Commission contends the "land" has been subject to flooding at least as a backwater area, and in the past the Commission has rejected permit applications for those areas. However, the Commission's right to monitor this tract as part of a "system" is not challenged; *it is the reasonableness of Condition One which is at issue.* In claiming its legal right to "reclaim" the land avulsed by an unnatural river diversion, Colony concedes the Commission may impose reasonable conditions on its restoration efforts to prevent adverse impacts upon the actual "wetland" as it existed before the avulsion.

*Is the Colony tract part of an "historic" wetland?* There is some evidence the area now commonly called San Dieguito Lagoon was at some distant time past approximately three times its present area. There is no evidence the now saturated area then included Colony's 2-1/2 acres.[5] Nor are we

---

[5]Had the Commission introduced evidence to show the contested area had met the legal definition of "wetland" until its status was changed by some illegal filling, then its argument the area continued to be a wetland for the purposes of its control might be relevant. In *City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 478-479 [91 Cal.Rptr. 23, 476 P.2d 423], the court held the status of certain property as "tidelands" referred to its condition at the time article XV, section 3 of the California Constitution (effective 1879) was enacted to prevent sales or grants to private persons, etc. It held it would be contrary to the spirit of the Constitution to conclude the section was to apply only to lands retaining physical characteristics of tidelands at the time of the proposed alienation, "[f]or such a construction would permit parties to remove public tidelands from the reach of the constitutional provision by simply filling so that such lands were no longer covered and uncovered by the flow and ebb of the tide." However, there is no evidence Colony's tract met that statutory definition at any time after the effective date of the Coastal Zone Conservation Act (§ 27000 et seq., which became effective for permit requirement purposes Feb. 19, 1973, and was the predecessor to Cal. Coastal Act of 1976).

cited to any authority which would lend significance to this fact even if proved. (The Army Corps of Engineers, charged with enforcing an analogous federal regulation protecting "wetlands," specifically disclaims jurisdiction to monitor dry lands merely because they were once part of a "wetland" system. (42 Fed. Reg. 37128 (July 19, 1977).))

The Commission's finding Colony's flooded parcel is now a protected "wetland" is not supported.

### PROPERTY OWNERS MAY EJECT WATERS FROM AND REFILL LAND AREAS ERODED BY FLOODING

Although the Commission sometimes describes the activity cutting away a portion of the tract property as avulsion, it contends it is not the type of "avulsion" which the common law or Civil Code section 1015 gives the landowner any right to reclaim lost land.

The Commission argues, whatever the common law, California has preempted it by enacting Civil Code section 1015 limiting rights of reclamation following the cutting off of a portion of land by water. For this argument, the Commission cites the dictionary definition of avulsion: "a sudden cutting off of land by flood, currents, or change in course of a body of water; *esp*: one that separates a portion from one person's property and joins it to that of another." (Websters Third New Internat. Dict. (1968) p. 152, col. 1.) This narrow definition is addressed in Civil Code section 1015: "If a river or stream, navigable or not navigable, carries away, by sudden violence, a considerable and distinguishable part of a bank, and bears it to the opposite bank, or to another part of the same bank, the owner of the part carried away may reclaim it within a year after the owner of the land to which it has been united takes possession thereof."

Thus, the Commission asks us to limit the legal doctrine of the right to reclaim lands altered by avulsion to those instances where an identifiable portion of one person's property has been severed and become attached to another's by an altered water course. (Apparently without regard as to whether the action causing the avulsion was natural or unnatural.) The Commission argues early court decisions had held title to the property "avulsed" was transferred to the party to whose property the avulsed land became joined. Thus, by allowing the party losing the land to "reclaim" it, the courts merely permitted reestablishment of the original boundary lines. Current case law states one who loses land by avulsion retains title to the property even though part of the land now may be under water. The Commission argues the common law right to "reclaim" was merely a right to "restore" original boundary by bringing back the same land which had been removed.

It then argues, because Colony's property lines were not altered when its bank was swept away, its common law right to restore its property to its original condition has not been triggered.

The Commission posits the issue as "Does the California Coastal Commission have the authority to apply the statutory definition of wetland to a piece of property which becomes inundated after the effective date of the Coastal Act . . . ?" ■ The superior court treated the issue somewhat more narrowly and correctly held the statutory definition in the coastal act, whatever else it means, does not include lands which were dry and not within any definition of "wetlands" before being subjected to sudden flooding and a carrying away of existing landmass. A contrary interpretation would lead to an inconsistency between the coastal act and Civil Code section 1015.

■ Civil Code section 1015 explicitly gives the owner of a still identifiable piece of land carried away by avulsion the right to reclaim it from the owner of any land to which it has become attached, and to return it to its original site so long as it is done within one year.

Since enactment in 1872, this section has generated no comment in any reported decision. The Commission argues this codification supersedes all common law rights to reclaim avulsed property even though the statute facially only addresses a portion of the common law rights and obligations arising from avulsive events. Specifically, it recognizes that, when an identifiable landmass has become attached to one person's property after being forcibly removed from another's, two or more separate property interests are now impacted. The original owner may, or may not, want to go to the expense of returning the specific land, the property to which the avulsed landmass is newly attached may be adversely affected by the attachment, or the new possessor may wish to utilize it. The statute recognizes the potential conflicts between the various landed interests and the importance of finalizing the possessory interests in the distinguishable land mass as soon as practicable. For this very practical reason, a statutory one-year limit was imposed on the land-losing property owner's right to recover the landmass from the new possessor.

Civil Code section 1015 does not address, or purport to limit, the right to fill in or replace the avulsed area should the losing party decide not to go to the expense of removing and returning the original land. It does not expressly restrict or alter any common law rights inuring to landowners whose properties were simply washed away. We do not read Civil Code section 1015 as implying a legislative intent to preempt the entire common

law of avulsion. The Commission's narrow interpretation leads to the absurd result that one whose property floats across the river, reaching the opposite bank, may bring it back, yet one whose parcel floats only halfway, becoming an island, could not.

District Director Crandall, testifying at the Commission hearings of August 27, 1982, declared his "belief" it was not appropriate under the coastal act policies to allow a landowner to "recapture" land lost through avulsion. The Commission's staff attorney "suggested" the right to recapture under these circumstances is somehow inconsistent with the public policy stated by the Legislature on enacting the coastal act to enhance the permanent protection of the ecosystem. Neither cited relevant authority.

We recognize the Legislature declared a need to protect the natural resources in the California Coastal Zone by protecting and balancing coastal development to maximize public access consistent with sound resources conservation and the constitutional protection of the rights of affected private property owners. (§§ 30001-30004.) However, nowhere do the protracted and detailed statements of legislative goals in the foregoing sections imply any legislative intent to take away any common law or statutory property rights. ■ Further, section 30233 merely limits "diking, filling, or dredging" of wetlands. Those limitations do not imply any legislative policy to alter existing property rights to recapture or restore avulsed lands. ■ Statutes may not be presumed to alter the common law except as the statute expressly provides. (*Saala* v. *McFarland* (1965) 63 Cal.2d 124, 130 [45 Cal.Rptr. 144, 403 P.2d 400].)

The only California reported decision even peripherally discussing a landowner's right to "reclaim" land flooded through avulsion appears to be *Bohn* v. *Albertson* (1951) 107 Cal.App.2d 738 [238 P.2d 128]. *Bohn* compares and analyzes decisions from other jurisdictions concerning the rights of landowners whose properties have become flooded through avulsion, and concludes the landowner does not lose title to the submerged lands and "the owners have the right to reclaim." (*Id.*, at p. 757.) *Bohn's* holding is limited to the question of title to the flooded property and the rights of the public in the navigable water coursing over it. However, *Bohn* expressly states there is a right to reclaim and implies the landowner can, by reclamation cut off any public right to encroach upon or use the lands within its boundaries.[6] A review of the decisions of other courts relied upon by *Bohn* shows

---

[6]*Bohn's* recognition of a right to reclaim is mentioned without criticism in the Supreme Court's opinion, *State of California* v. *Superior Court (Lyon)* (1981) 29 Cal.3d 210, 230, footnote 18 [172 Cal.Rptr. 696, 625 P.2d 239].

they are cases in which the rights of the landowners were considered in light of specific reclamations. *Simpson* v. *Moorhead* (1904) 65 N.J.E. 623 [56 A. 887] involved overflowed lands which were banked and filled to eject and exclude the water from overflowing the lands as well as raising the level of the land itself. *Schwartzstein* v. *B. B. Bathing Park* (1922) 203 App.Div. 700 [197 N.Y.S. 490, 492] permitted the installation of a bulkhead on the boundaries of certain real property and filling behind it to "reclaim" land torn away by violent storms, an activity similar to the present request. Others, such as *City of New York* v. *Feltman* (1930) 230 App.Div. 299 [243 N.Y.S. 625], discuss reclamation in the context of excluding water from private lands. Thus, although it was not necessary for *Bohn* to determine what acts fall within a legal definition of "reclamation," the cases it relies upon specifically allowed the flood waters to be excluded and kept from the flooded lands, and such lands to be restored to their original contours.

 We hold a property owner has a legal right to eject overflowing waters and to replace land lost through avulsion, subject only to time limits imposed on those special circumstances addressed in Civil Code section 1015, and subject to reasonable conditions which may be imposed by special regulatory agencies having jurisdiction over the area in which the property lies. Thus, Colony's right to restore its avulsed lands adjacent to a protected "wetland" is subject to overview by the Commission and, if this restoration significantly intrudes into or alters the lagoon, the Commission may impose reasonable conditions.

### SPECIAL CONDITION ONE IS NOT REASONABLE UNDER THE CIRCUMSTANCES OF THIS CASE

 Colony's proposed restoration and development were submitted as a package. Colony proposes to do more than fill in a portion of its inundated property, its proposed revetment will extend into the lagoon. The extension will not only protect the proposed development, but also the existing Camino Del Mar and Santa Fe Railroad bridges, an adjacent apartment complex and the City of Del Mar's drainage outlet, thus providing flood control protection to the adjacent low-lying areas of northern Del Mar. In addition, it will enhance Del Mar's own available wetlands.

The Commission recognized the importance of the additional protection to be afforded by extending the proposed installation. The City of Del Mar[7]

---

[7]In materials submitted during the Commission hearings, and in amicus briefs filed at the trial court, and here, Del Mar supports Colony's position.

approved the project as proposed. (As did the Army Corps of Engineer, State Lands Commission and the California Department of Fish and Game.)

In spite of the benefits the proposed revetment may bring by stabilizing the City of Del Mar's drainage situation and protecting the existing railroad bridges and low-lying adjacent areas, the Commission was not required to approve the proposed incursions into the lagoon since it unquestionably will require substantial dredging and filling impacting the protected area. Accordingly, imposing relevant conditions upon Colony's right to so intrude is well within its powers. Colony does not argue otherwise. For instance, it is lawful to condition approval upon there being no net decrease in submerged wetland area by virtue of the incursions. Condition One is specifically directed to that issue, but errs because it considered the decrease in the submerged areas presently within Colony's boundaries as diminishing the protected area of the lagoon itself. The legitimate scope of such a condition is fully addressed by an uncontested special requirement Colony provide additional "wetlands" twice as large in area as those lost by virtue of the construction.

Finally, the Commission argues it may impose any conditions reasonably related to the purposes of the coastal act whether the proposed development created the needs addressed by the conditions, or not. (See *Georgia-Pacific Corp.* v. *California Coastal Com.* (1982) 132 Cal.App.3d 678, 698-699 [183 Cal.Rptr. 395]; *Associated Home Builders, etc., Inc.* v. *City of Walnut Creek* (1971) 4 Cal.3d 633, 638-640 [94 Cal.Rptr. 630, 484 P.2d 606, 43 A.L.R.3d 847].) Assuming this is so, the record shows the Commission only purports to justify imposing Condition One because of its mistaken assumption the inundated portion of Colony's land was a protected "wetland."

The superior court struck Condition One in its entirety, it did not remand to the Commission for further proceedings. The Commission suggests even if the trial court's conclusions were correct the matter must be remanded for its reconsideration, including the right to disapprove the entire project absent Condition One. However, we find the Commission has already carefully, and at length, considered and imposed conditions comprehensively regulating any filling and construction work inside the lagoon proper, and mitigating or compensating any potential adverse impacts from the proposed development.[8] There is no need to remand.

---

[8]Some of the special conditions not challenged require Colony to record an irrevocable offer to publicly dedicate all its land area waterward of the revetment and allow public access and passive recreational use along a 50-foot strip of its property landward. In addition, Colony is to provide a two-for-one replacement of all "wetland" area lost from within the pre-1980 lagoon area. However, this new "wetland" need not be taken from Colony's two-and-one-half-acre tract.

Judgment affirmed.

Brown (Gerald), P. J., and Cologne, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 16, 1984. Reynoso, J., was of the opinion that the petition should be granted.