[No. D034287. Fourth Dist., Div. One. Aug. 22, 2000.]

CHRISTOPHER KIRKOROWICZ et al., Plaintiffs and Respondents, v. CALIFORNIA COASTAL COMMISSION, Defendant and Appellant.

COUNSEL

Bill Lockyer, Attorney General, Richard Frank, Chief Assistant Attorney General, J. Matthew Rodriguez, Assistant Attorney General, Daniel L. Siegel and Lisa Trankley, Deputy Attorneys General, for Defendant and Appellant.

Stephenson, Worley, Garratt, Schwartz, Garfield & Prairie and Donald R. Worley for Plaintiffs and Respondents.

OPINION

**WORK, J.**—The California Coastal Commission (Commission) appeals a judgment issuing a peremptory writ of administrative mandamus directing it to set aside its decision denying brothers Christopher and Gregory Kirkorowicz a coastal development permit (CDP) to expand horse stables and boarding facilities on their Encinitas property and to rehear the matter to determine whether the property includes protected wetlands. Challenging the trial court's determination that the record lacks substantial evidence to support a finding the property does contain a jurisdictional wetland, the Commission contends the record substantially documents the existence of wetlands entitled to protection by the California Coastal Act of 1976 (Pub. Resources Code,[1] § 30000 et seq.) (Coastal Act) and the City of Encinitas Local Coastal Program (LCP).[2] We conclude substantial evidence supports the Commission's finding that jurisdictional wetlands exist on the Kirkorowiczes' property at the proposed development site. Accordingly, we reverse the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

The Kirkorowiczes' 21.47-acre property consists of three separate legal parcels. It is irregularly shaped, zoned rural/residential permitting one single-family residential unit per parcel and private stables by right, and located in the Olivenhain community of the City of Encinitas (City). This periodically flooded property lies north of San Elijo Lagoon Preserve within the 100-year floodplain of the Escondido Creek, which forms its eastern boundary. Consistent with the Encinitas General Plan Policies, which encourage equestrian activities in the floodplain, the Kirkorowiczes currently board horses on their property using corrals and fences.

---

[1] All statutory references are to the Public Resources Code unless otherwise specified.

[2] Although the Coastal Act initially vests the Commission with the authority to issue permits for any coastal development (§ 30600, subd. (a)), local governments may assume permitting authority by adopting local coastal programs that are certified by the Commission (§§ 30512, 30519).

In 1994, the Kirkorowiczes applied to City for a CDP to board a maximum of 42 horses and to construct an approximately 1,728-square-foot enclosed stable, a storage area for supplies and manure, a driveway and a car/horse trailer turnaround area. The proposal included a 27,000-square-foot building pad to be created by placing 8,700 cubic yards of fill on the site. City hired biologist Vincent N. Scheidt to evaluate the permit application, to survey the biological resources and to determine whether the proposal would impact wetlands.[3] In a series of reports between October 1995 and July 1996, Scheidt determined that parts of the project were proposed to be developed in wetlands; concluded the project would have a direct, minor impact on marginal wetland habitat areas; identified the wetlands plant species found onsite; mapped the wetlands onsite; and concluded the project would result in a direct loss of .44 acre of jurisdictional wetlands, but that the potentially significant loss was mitigable. On behalf of the Kirkorowiczes, John W. Brown, senior biologist with Dudek & Associates, visited the site in March 1996 and concluded that using United States Army Corps of Engineers's standards for determining jurisdictional wetlands, "wetland hydrology is absent from this portion [the locus of the proposed fill] of the site." However, the Kirkorowiczes' habitat mitigation plan conceded that project implementation would permanently impact .44 acre of very low-quality wetland. Given the historical use of the property as grazing land, the wetlands resource was described as "degraded" in the environmental documentation.

The original project site plan proposed two driveways. Due to the horizontal curve along Manchester Avenue and the obstruction of visibility due to the dirt embankment on Manchester Avenue across from the project site, the original driveway design did not meet City standards for safe stopping sight distance. Consequently, the project was revised to place a single driveway at the southerly end of the building pad that met sight-line requirements for safe ingress from and egress to Manchester Avenue. During City review, the Kirkorowiczes agreed to reduce the proposed wetlands fill and move the pad area closer to the northern boundary to minimize possible wetlands and visual impacts. Later, before the Commission, they further agreed to reduce the area of wetlands impact to .35 acre.

On January 9, 1997, the City Planning Commission (CPC) approved the project, concluding the project would not impose any significant environmental impact that would not be reduced to a level below significant by the required mitigation measures established by the EIA. The San Elijo Lagoon

---

[3]More precisely, in order to comply with the California Environmental Quality Act, City hired a consulting firm to prepare an extended initial assessment (EIA) of the Kirkorowiczes' proposal. The wetlands identification work for the EIA was performed by Scheidt.

Conservancy, a local preservation group, appealed the CPC's decision to the city council. On May 14, the city council approved the project and the issuance of a CDP for construction of the 1,728-square-foot stable facility to board up to 39 horses, involving placement of approximately 8,700 cubic yards of fill in approximately .44 acre of wetlands within the 100-year floodplain. On June 2, the matter was appealed to the Commission. On April 8, 1998, by a vote of nine to zero, the Commission followed its staff's recommendation and denied the project as inconsistent with City's certified LCP regarding floodplain development (Land Use Policy 8.2 of the Land Use Plan (LUP)[4]) and protection of wetlands (LUP Resource Management Element Policy 10.6[5]). Specifically, the staff concluded the proposed fill of wetlands to accommodate vehicle access and a turnaround is not permitted

[4]LUP Land Use Policy 8.2 provides: "Development within coastal and flood plain areas identified in the Land Use and Resource Management Elements must be limited, designed to minimize hazards associated with development in these areas, and to preserve area resources. Within the floodway, channelizations, dams, or other substantial alterations of rivers and streams shall incorporate the best mitigation measures feasible, and be limited to necessary water supply projects, flood control projects where no other method for protecting existing public or private structures is feasible and where such protection is necessary for public safety or to protect existing development, and other development where the primary function is the improvement of fish and wildlife habitats. No development shall occur in the 100-year Floodplain that is not consistent and compatible with the associated flood hazard. Only uses which are safe and compatible with periodic flooding and inundation shall be considered, such as stables, plant nurseries, a minimum intrusion of open parking, some forms of agriculture, and open space preservation, as appropriate under zoning, and subject to applicable environmental review and consistency with other policies of this Plan. No grading or fill activity other than the minimum necessary to accommodate those uses found safe and compatible shall be allowed. Such grading shall not significantly redirect or impede flood flows or require floodway modifications. Exceptions from these limitations may be made to allow the following: [¶] a. Minimum private development (defined as one dwelling unit per legal parcel under residential zoning, and an equivalent extent of development under non-residential zoning) only upon a finding that strict application thereof would preclude a minimum use of the property. [¶] b. Development of circulation element roads, other necessary public facilities, flood control projects where no feasible method for protecting existing public or private structures exists and where such protection is necessary for public safety or to protect existing development, and any other development which has as its objective the improvement of fish and wildlife habitat. [¶] c. Limited reconfiguration of the flood plain in previously degraded areas provided it is determined by the City that the reconfiguration of the flood plain is incidental to the improvement of an overall storm water system and that the reconfigured storm water system is substantially based on natural channels with vegetation to accommodate storm water management. This is applicable to the El Camino Real creek corridor draining into Encinitas Creek. [¶] These exceptions shall be allowed only to the extent that no other feasible alternatives exist and minimum disruption to the natural floodplain environment is made. The City shall not approve subdivisions or boundary line adjustments which would allow increased impacts for development in 100-year floodplains. For specific policy provisions regarding wetlands which may be associated with floodplains, refer to Resource Management Element Policy 10.6."

[5]LUP Resource Management Element Policy 10.6 provides: "The City shall preserve and protect wetlands within the City's planning area. 'Wetlands' shall be defined and delineated consistent with the definitions of the U.S. Fish and Wildlife Service, U.S. Army Corps of

under the LCP and that other alternatives to provide safe access to the site and avoid filling the wetlands had not been adequately explored.

The Kirkorowiczes' petition for a writ of administrative mandamus challenged the Commission's decision on several grounds. However, by the time of the hearing on May 7, 1999, the parties agreed that in light of this court's decision in *Bolsa Chica Land Trust v. Superior Court* (1999) 71 Cal.App.4th 493 [83 Cal.Rptr.2d 850], the Kirkorowiczes' intended construction of a stable under an implied historic use exception was no longer permitted in the wetlands and thus their argument focused on whether their project would affect jurisdictional wetlands. In granting the petition, the trial court declared: "In this matter, it appears to the Court that the Coastal Commission

Engineers, the Coastal Act and the Coastal Commission Regulations, as applicable, and shall include, but not be limited to, all lands which are transitional between terrestrial and aquatic systems where the water table is usually at or near the surface or the land is covered by shallow water. [¶] There shall be no net loss of wetland acreage or resource value as a result of land use or development, and the City's goal is to realize a net gain in acreage and value whenever possible. [¶] Within the Coastal Zone, the diking, filling, or dredging of open coastal waters, wetlands, estuaries, and lakes shall be permitted where there is no feasible less environmentally damaging alternative, and where feasible mitigation measures have been provided to minimize adverse environmental effects, and shall be limited to the following newly permitted uses and activities: [¶] a. Incidental public service projects. [¶] b. Mineral extraction, including sand for restoring beaches, except in environmentally sensitive areas. [¶] c. Restoration purposes. [¶] d. Nature study, aquaculture, or other similar resource dependent activities. [¶] Identification of wetland acreage and resource value shall precede any consideration of use or development on sites where wetlands are present or suspected. With the exception of development for the primary purpose of the improvement of wetland resource value, all public and private use and development proposals which would intrude into, reduce the area of, or reduce the resource value of wetlands shall be subject to alternatives and mitigation analyses consistent with Federal E.P.A. 404(b)(1) findings and procedures under the U.S. Army Corps permit process. Practicable project and site development alternatives which involve no wetland intrusion or impact shall be preferred over alternatives which involve intrusion or impact. Wetland mitigation, replacement or compensation shall not be used to offset impacts or intrusion avoidable through other practicable project or site development alternatives. When wetland intrusion or impact is unavoidable, replacement of the lost wetland shall be required through the creation of new wetland of the same type lost, at a ratio determined by regulatory agencies with authority over wetland resources, but in any case at a ratio of greater than one acre provided for each acre impacted so as to result in a net gain. Replacement of wetland on-site or adjacent, within the same wetland system, shall be given preference over replacement off-site or within a different system. [¶] The City shall also control use and development in surrounding areas of influence to wetlands with the application of buffer zones. At a minimum, 100-foot wide buffers shall be provided upland of salt water wetlands, and 50-foot wide buffers shall be provided upland of riparian wetlands. Unless otherwise specified in this plan, use and development within buffer areas shall be limited to minor passive recreational uses with fencing, desiltation or erosion control facilities, or other improvements deemed necessary to protect the habitat, to be located in the upper (upland) half of the buffer area when feasible."

Additionally, section 30.34.040(B)(3)(a) of City's "Implementation Plan" contains similar language as above, limiting wetland fill to projects involving nature study, restoration, incidental public services and mineral extraction.

conducted its proceedings operating under the *presumption* that the subject property was a protected wetland. However, after having reviewed the administrative record, the Court finds that there is *not* substantial evidence to support a finding that the Kirkorowicz' property is a protected wetland as contemplated by the Coastal Act, § 30121 and the City's Local Coastal Program Policy 10.6. Accordingly, absent substantial evidence to support the conclusion that the property involves a wetland, the decision denying the CDP was erroneous." On July 19, 1999, the judgment issuing the peremptory writ was filed, directing the Commission to set aside its April 8, 1998 decision denying the CDP, to rehear the matter and to determine whether there are protected wetlands on the Kirkorowiczes' property. The Commission timely appealed.

## THE STANDARD OF REVIEW

█ Because this matter came to the trial court on a petition for a writ of mandate under Code of Civil Procedure section 1094.5, that court was required to determine whether substantial evidence supported the Commission's findings and whether those findings supported its decision. (*Bolsa Chica Land Trust v. Superior Court, supra,* 71 Cal.App.4th at p. 502.) Our role is identical to that of the trial court. (*Id.* at p. 503; *Saad v. City of Berkeley* (1994) 24 Cal.App.4th 1206, 1212 [30 Cal.Rptr.2d 95]; *Sierra Club v. California Coastal Com.* (1993) 12 Cal.App.4th 602, 610 [15 Cal.Rptr.2d 779]; *City of San Diego v. California Coastal Com.* (1981) 119 Cal.App.3d 228, 232 [174 Cal.Rptr. 5].) In determining whether substantial evidence supports the Commission's decision, we look to the "whole" administrative record and consider all relevant evidence, including that evidence which detracts from the decision. Although this task involves some weighing to fairly estimate the worth of the evidence, that limited weighing does not constitute independent review where the court substitutes its own findings and inferences for that of the Commission. Rather, it is for the Commission to weigh the preponderance of conflicting evidence, as we may reverse its decision only if, based on the evidence before it, a reasonable person could not have reached the conclusion reached by it. (*Bolsa Chica Land Trust v. Superior Court, supra,* 71 Cal.App.4th at p. 503; *Sierra Club v. California Coastal Com., supra,* 12 Cal.App.4th at p. 610.)

## THE RECORD CONTAINS SUBSTANTIAL EVIDENCE THAT WETLANDS EXIST ON THE KIRKOROWICZES' PROPOSED PROJECT SITE

█ Emphasizing wetlands are areas within the coastal zone that may be covered periodically or permanently with shallow water and are characterized by hydric soils and/or hydrophytes, the Commission contends the

administrative record contains substantial evidence there are wetlands on the Kirkorowiczes' property. It asserts the area in which the Kirkorowiczes intend to put their driveway and turnaround is covered periodically with shallow water, is marked by the presence of hydrophytes, and was identified by City's consulting biologist as wetlands. In response, the Kirkorowiczes echo their plea below that in light of our decision in *Bolsa Chica Land Trust v. Superior Court, supra,* 71 Cal.App.4th at pages 515-516, "absolutely prohibiting" the Commission from approving any encroachment into wetlands, except for the enumerated uses permitted by section 30233, it is incumbent upon the Commission to take a much closer look at what, in fact, constitutes protected wetlands and thus their case requires reevaluation. They assert that the occasionally wet area on their property is not remotely of the character the Coastal Act was intended to protect. Rather, they contend the Coastal Act was intended to protect areas predominantly much wetter than the area in dispute. They argue the periodic coverage of an area with water is not determinative of whether property constitutes a wetland; the wet areas on their property are not part of a marine environment; the mere presence of some hydrophytes is not determinative; and there is no substantial evidence of wetlands hydrology or hydric soils on their property.

The Coastal Act defines "wetland" in section 30121 as "lands within the coastal zone which may be covered periodically or permanently with shallow water and include saltwater marshes, freshwater marshes, open or closed brackish water marshes, swamps, mudflats, and fens."[6] Although the Commission relies on the cited definition to identify "wetlands," by necessity it has expanded the definition, given the highly variable environmental conditions along the California coast rendering some wetlands not readily identifiable by simple means. In its expanded definition, the Commission includes those lands where "saturation with water is the dominant factor determining the nature of soil development and the types of plant and animal communities living in the soil and on its surface." (See Statewide Interpretive Guideline for Wetlands and Other Wet Environmentally Sensitive Habitat Areas, adopted Feb. 4, 1981, by the Cal. Coastal Com. (Interpretive Guideline) at p. 78, appen. D;[7] *Beach Colony II v. California Coastal Com.* (1984) 151 Cal.App.3d 1107, 1113 [199 Cal.Rptr. 195].) Consequently, the

---

[6]We note that "wetlands" is also defined in the Keene-Nejedly California Wetlands Preservation Act (§ 5810 et seq.) as "streams, channels, lakes, reservoirs, bays, estuaries, lagoons, marshes, and the lands underlying and adjoining such waters, whether permanently or intermittently submerged, to the extent that such waters and lands support and contain significant fish, wildlife, recreational, aesthetic, or scientific resources." (§ 5812, subd. (a).)

[7]The Commission's interpretation as set forth in its Interpretive Guideline is entitled to great weight. (*Bolsa Chica Land Trust v. Superior Court, supra,* 71 Cal.App.4th at p. 513; *Coronado Yacht Club v. California Coastal Com.* (1993) 13 Cal.App.4th 860, 868 [17 Cal.Rptr.2d 10].)

Commission's regulations further describe wetlands as "land where the water table is at, near, or above the land surface long enough to promote the formation of hydric soils or to support the growth of hydrophytes . . ." (Cal. Code Regs., tit. 14, § 13577, subd. (b)(1)), thus recognizing "the presence or absence of hydrophites [*sic*] and hydric soils are the most useful, but not exclusive, criteria to determine whether a particular parcel is a 'wetland.'" (*Beach Colony II v. California Coastal Com., supra*, 151 Cal.App.3d at p. 1113.) The Commission explains: "[T]he single feature that most wetlands share is soil or substrate that is at least periodically saturated with or covered by water, and this is the feature used to describe wetlands in the Coastal Act. The water creates severe physiological problems for all plants and animals except those that are adapted for life in water or in saturated soil, and therefore only plants adapted to these wet conditions (hydrophytes) could thrive in these wet (hydric) soils. Thus, the presence or absence of hydrophytes and hydric soils make excellent physical parameters upon which to judge the existence of wetland habitat areas for the purposes of the Coastal Act, but they are not the sole criteria. In some cases, proper identification of wetlands will require the skills of a qualified professional." (Interpretive Guideline, *supra*, at p. 78, appen. D.)

Additionally, two years before the Commission's adoption of the Interpretive Guideline, the United States Fish and Wildlife Service (Service) had officially adopted a wetland classification system which defined and classified wetland habitats in these terms and utilized a definition based on the identical feature of soil or substrate that is at least periodically saturated or covered by water. Consequently, the Commission in 1981 adopted that system as a guide in wetland identification. (Interpretive Guideline, *supra*, at pp. 78-79, appen. D.) The Service defined "wetlands" as "lands transitional between terrestrial and aquatic systems where the water table is usually at or near the surface or the land is covered by shallow water. For purposes of this classification, wetlands must have one or more the following three attributes: (1) at least periodically, the land supports predominantly hydrophytes; (2) the substrate is predominantly undrained hydric soil; and (3) the substrate is nonsoil and is saturated with water or covered by shallow water at sometime during the growing season of each year." (*Id.* at p. 79, appen. D.)

Our review of the administrative record convinces us that substantial evidence supports the Commission's finding that protected wetlands exist on the Kirkorowiczes' property. Guided by the foregoing broad definition of wetlands, substantial evidence shows the proposed site requiring fill is periodically covered with shallow water and is replete with hydrophytes, and that it specifically has been identified by City's consulting biologist, Scheidt,

as wetlands. Preliminarily, located within the 100-year floodplain[8] of the Escondido Creek, the testimonial and photographic evidence shows the development area is periodically covered with shallow water, as even moderate rain causes the area to become submerged and flooded. In fact, since 1982, the Kirkorowiczes' property has been flooded to an extreme depth on an average of two to three times a year, and on countless other occasions has been significantly impacted by average rainfall regardless whether occurring during a wet or dry season. Another professional biologist confirmed this "obvious" inundation lasting for some time each year. Second, the record is replete with evidence of the presence of hydrophytes in the development area. The development site involves two broadly overlapping plant communities: ruderal, non-native, mostly upland vegetation associated with intensive agricultural or equestrian site usage, and very low-quality, but mostly native, floodplain fringe wetlands vegetation in areas which are subject to longer periods of hydration during the rainy season. Consulting biologist Scheidt inventoried the flora and fauna he observed and classified the species based on their primary habitat. Of the 42 species of flora he recorded, 18 were wetland species. Four of these species are included in the Commission's representative list of wetland species in its Interpretive Guideline. (Interpretive Guideline, *supra*, at p. 84, appen. D.) A third party professional biologist who conducted a field site inspection concluded the site to be a high-quality functional wetland habitat dominated by these wetland species. Scheidt concluded that a portion of the property proposed for development supported areas of jurisdictional wetlands, relying primarily on the presence or absence of indicator wetland plant species. He noted: "All wetland areas, even those in a heavily disturbed state, are considered significant biological resources in so far as they have a potential to buffer adjacent, higher quality areas. In this case, much higher quality wetland habitat is present to the south beyond the limits of the proposed site development area." His second study, designed to formulate a more precise site-based wetlands delineation and to ascertain the boundary between wetland and upland habitat areas, utilized the "Unified Federal Method" to the extent possible, which requires consideration of hydrology, hydric soils and hydric vegetation in order to obtain delineation.[9] Again, he concluded the site supports areas of jurisdictional wetlands, as reflected in figure 1 attached to

---

[8]The Kirkorowiczes correctly point out that lands within a 100-year floodplain have never been defined as wetlands per se in any statute, guideline or case.

[9]This methodology was adopted in 1989 when the four federal agencies (Environmental Protection Agency, the Army Corps of Engineers, the Fish and Wildlife Service, and the Soil Conservation Service) that were principally involved in the identification and delineation of wetlands merged their methods and issued the Federal Manual for Identifying and Delineating Jurisdictional Wetlands 1 (1989) (1989 Manual). (See *U.S. v. Ellen* (4th Cir. 1992) 961 F.2d 462, 464-465; 1989 Manual, *supra*, at p. 1; Johnson et al., *Bogged Down Trying to Define Federal Wetlands* (Spring 1996) 2 Tex. Wesleyan L.Rev. 481, 486-487.)

the report.[10] (See appen. at p. 996, *post.*) In his final report, he echoed these findings while presenting an assessment of the local regional significance of the biological resources present on the site and defining on-site vegetation, and identifying those sensitive plant and animals species found in association with the property.

The Kirkorowiczes first attack the Commission's focus on the statutory language defining wetland in part as "lands within the coastal zone which may be covered periodically . . . with shallow water . . . ." (§ 30121.) Relying on the exemplars that follow the cited statutory language of "salt-water marshes, freshwater marshes, open or closed brackish water marshes, swamps, mudflats, and fens" (*ibid.*), they assert the language as a whole evinces an intent to limit protectible wetlands to significant natural resources that are typically much wetter than temporary wet conditions present on their property.[11] Further, citing their biologist's June 1996 opinion their property did not involve wetland hydrology, they contend no substantial evidence exists of wetlands hydrology or hydric soils. However, under the Commission's Interpretive Guideline and regulations, although water saturation is a dominant factor in determining the nature of soil development and the types of flora and fauna living in the soil and on its surface, evidence of wetlands hydrology or hydric soils is not per se required for property to be classified as wetlands. Rather, "[w]etland shall be defined as land where the water table is at, near, or above the land surface long enough to promote the formation of hydric soils *or* to support the growth of hydrophytes . . . ." (Cal. Code Regs., tit. 14, § 13577, subd. (b)(1), italics added.) Consequently, evidence that hydrophytes exist on a property to a degree permitting jurisdictional wetland determination renders unnecessary any additional evidence of wetland hydrology or hydric soils.

Within this context, the Kirkorowiczes challenge Scheidt's findings and methodology, asserting the mere presence of some hydrophytes on the

[10]Scheidt notes the property abuts the northwestern edge of the Escondido Creek Biological Core and Linkage Area (BCLA), which is identified in the North County Wildlife Forum's May 1995 Multiple Habitat Conservation Plan as a critical element of the subarea's future Habitat Conservation Plan (HCP). He explains that with formal adoption and approval of the HCP, the BCLA would be converted to an open space habitat preserve to which the Kirkorowiczes' property would serve as a buffer.

The Interpretive Guideline recognizes that the Coastal Act requires wetlands be maintained and where feasible restored, and that they are not isolated, independently functioning systems but rather dependent upon and highly influenced by their surroundings. Indeed, the Commission cautions that when it determines that any adjacent area is necessary to maintain the functional capacity of a wetland, it will require the area be protected against any significant disruption of habitat values consistent with section 30240, subdivision (a). (Interpretive Guideline, *supra,* at pp. 31, 33.)

[11]The Kirkorowiczes further note the statute (§ 30233) that restricts wetlands development is located in article 4 of the Coastal Act entitled "Marine Environment," asserting their property is not marine environment by any stretch of the imagination.

property is not determinative as Scheidt ignored the concept of *predominance* in determining whether jurisdictional wetlands existed. More precisely, they fault Scheidt's delineation of wetlands because he did not measure the predominance of hydrophytes as required by the Service's classification system, but simply noted their presence. Utilizing Scheidt's flora inventory, they assert that only 43 percent of the total species listed were wetlands species, failing to demonstrate the predominance necessary to indicate jurisdictional wetlands.[12]

Preliminarily, the Kirkorowiczes' attempt to discredit Scheidt's jurisdictional wetlands delineation based upon his identification of 18 species of hydrophytes out of 42 species of plants found on the site is misguided. It is the spatial extent of the wetland species that are directly discernible or measurable in the field compared to those that are not hydrophytes which determines predominance, not the number of separate species of hydrophytes present.[13] Given Scheidt's reports were silent regarding the spatial extent of the hydrophytic species found on the property, an express showing of predominance based upon spatial quantification is not independently discernible from the data he provided.[14]

[12]The Kirkorowiczes also contend Scheidt's work cannot be substantial evidence of wetlands, because his final report apparently did not consider the first redesigned project, let alone the final one. Granted, the Kirkorowiczes redesigned the project twice. The first redesign was in response to concerns raised by City planners and was analyzed by City's environmental consultants who concluded it would affect .44 acre of wetlands. The second redesign reduced the amount of impacted wetlands to .35 acre. Their attorney by letter urged the Commission to approve the Kirkorowiczes' application, declaring that as revised the fill only affected .35 acre of wetlands, a reduction of 20 percent of that approved by City. This acknowledgment was repeated at the hearing.

The Kirkorowiczes further argue their project does not meet the definition of "fill" because it is not being placed in a "submerged" area. Casting aside that this argument appears to contradict their attorney's letter cited above and was never ruled upon by the trial court although presented, such an interpretation would permit development in any wetland that is not "submerged." A result, we suggest, that is clearly contrary to the intent and letter of the definition of wetlands and the restrictions on development in them (§ 30233).

[13]The 1989 Manual explains: "Dominance . . . refers strictly to the spatial extent of a species that is directly discernable or measurable in the field. When identifying dominant vegetation within a given plant community, one should consider dominance within each stratum. All dominants are treated equally in characterizing the plant community to determine whether hydrophytic vegetation is present. The most abundant plant species (when ranked in descending order of abundance and cumulatively totaled) that immediately exceed 50 percent of the total dominance measure for a given stratum, plus any additional species comprising 20 percent or more of the total dominance measure for that stratum are considered dominant species for the stratum. Dominance measures include percent areal coverage and basal area, for example." (1989 Manual, *supra*, at p. 9.)

[14]Nevertheless, we note a third party professional biologist characterized the wetlands portion of the Kirkorowiczes' property as being dominated by the wetland species of *Distichlis spicata*, *Salicornia virginica* and *Frankenia grandifolia*. Moreover, the Kirkorowiczes' own consultant identified 20 plant species in the area designated as wetlands

However, more crippling to their argument is that it erroneously rests on the presumption Scheidt only relied on the presence of hydrophytes in reaching his final jurisdictional wetlands determination and ignored the element of predominance. He did not. In his second report designed to provide the jurisdictional wetlands delineation utilizing the Unified Federal Method so as to obtain a precise quantification of the area of wetlands proposed to be impacted by the development site, he expressly declared he considered the site hydrology and hydric soils in reaching his determination, but that his resulting delineation was based heavily on the distribution of hydric vegetation on the site. Consistent with his listing of 18 species of hydrophytes, his expert conclusion the site involved jurisdictional wetlands was predicated upon not only twice personally surveying the site, his plant and animal species inventory for the site, and his general observations, but also his express adherence to the Unified Federal Method for wetlands delineation. As intended by the four federal agencies (see fn. 9, *ante*), the 1989 Manual serves as an interpretive guide for federal personnel in identifying jurisdictional wetlands based on hydrophytic vegetation,[15] hydric soils

by Scheidt, finding one species that almost always is found in wetlands, seven species that are usually found in wetlands, one species that is occasionally found in wetlands, seven species that are equally found in wetlands and nonwetlands, and four species that have no wetland association. In fact, he found three wetlands species that Scheidt did not, increasing the combined aggregate of the two surveys to 21 plant species whose primary habitat is wetlands.

[15] The 1989 Manual defines hydrophytic vegetation "as macrophytic plant life growing in water, soil or on a substrate that is at least periodically deficient in oxygen as a result of excessive water content." (1989 Manual, *supra*, at p. 5.) The National List of Plant Species That Occur in Wetlands "separates vascular plants into four basic groups, commonly called 'wetland indicator status,' based on a plant species' frequency of occurrence in wetlands: (1) obligate wetland plants (OBL) that occur almost always (estimated probability 99%) in wetlands under natural conditions; (2) facultative wetland plants (FACW) that usually occur in wetlands (estimated probability 67-99%), but occasionally are found in nonwetlands; (3) facultative plants (FAC) that are equally likely to occur in wetlands or nonwetlands (estimated probability 34-66%); and (4) facultative upland plants (FACU) that usually occur in nonwetlands (estimated probability 67-99%), but occasionally are found in wetlands (estimated probability 1-33%). If a species occurs almost always (estimated probability 99%) in nonwetlands under natural conditions, it is considered an obligate upland plant (UPL). These latter plants do not usually appear on the wetland plant list; they are listed only when found in wetlands with a higher probability in one region of the country. If a species is not on the list, it is presumed to be an obligate upland plant." (1989 Manual, *supra*, at p. 5.)

"An area has hydrophytic vegetation when, under normal circumstances: (1) more than 50 percent of the composition of the dominant species from all strata are obligate wetland (OBL), facultative wetland (FACW), and/or facultative (FAC) species, or (2) a frequency analysis of all species within the community yields a prevalence index value of less than 3.0 (where OBL = 1.0, FACW = 2.0, FAC = 3.0, FACU = 4.0, and UPL = 5.0) . . . . [¶] For each stratum (e.g., tree, shrub, and herb) in the plant community, dominant species are the most abundant plant species (when ranked in descending order of abundance and cumulatively totaled) that immediately exceed 50 percent of the total dominance measure (e.g., basal area or areal coverage) for the stratum, plus any additional species comprising 20 percent or more of the total dominance measure for the stratum. All dominants are treated equally in

and wetland hydrology by providing a uniform national procedure for wetland determinations. (*U.S. v. Ellen, supra,* 961 F.2d at pp. 465-466; 2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 1999) § 20.54, pp. 814-815.)[16]

Consistent with the 1989 Manual, Scheidt considered the site hydrology and hydric soils, as well as the distribution of hydric vegetation on the site, in reaching his jurisdictional wetlands delineation. He explained: "Portions of the Kirkorowicz property show signs of long-standing human use. These are most evident in the site's northwestern corner, where the existing pasture areas are located. In order to provide a site-based wetlands delineation, utilizing the Unified Federal Method to the extent possible (considering existing site use), I conducted a focused field reconnaissance for delineation purposes on 14 November 1995. The Unified Federal Method for wetlands delineation requires the consideration of three measurable factors: hydrology, hydric soils, and hydric vegetation. The purpose of the field reconnaissance was to ascertain the boundary between wetland and upland habitat areas, based on the limits of wetland (hydric) indicator vegetation and species. A consideration of site hydrology and hydric soils was made, although the resulting delineation is based heavily on the distribution of hydric vegetation. Indicators which were used in this effort include Salt Grass (*Distichilis spicata*), Alkali Weed (*Cressa truxillensis*), Woody Glasswort (*Salicornia virginica*), Salty Dodder (*Cuscuta salina*), Frankenia (*Frankenia salina*), and other herbaceous perennials. An effort was made to map the limits of the wetland indicators in the field, although the very disturbed nature of the site made field mapping difficult, especially in the area where ruderal upland vegetation transitioned to disturbed wetlands vegetation within active pasture areas. Several ground and aerial photographs of the Kirkorowicz property were then examined in an effort to more accurately delineate the boundary between wetland and upland habitats. The result of

determining the presence of hydrophytic vegetation." (1989 Manual, *supra,* at pp. 5-6, italics omitted.)

[16]Under the subheading "Problem Area Wetlands," the 1989 Manual pertinently instructs: "*Highly variable seasonal wetlands*—In many regions (especially in arid and semiarid regions), depressional areas occur that may have indicators of all three wetland criteria during the wetter portion of the growing season, but normally lack indicators of wetland hydrology and/or hydrophytic vegetation during the drier portion of the growing season. In addition, some of these areas lack field indicators of hydric soil. OBL and FACW plant species normally are dominant during the wetter portion of the growing season, while FACU and UPL species (usually annuals) may be dominant during the drier portion of the growing season and during and for some time after droughts. Examples of highly variable seasonal wetlands are pothole wetlands in the upper Midwest, playa wetlands in the Southwest, and vernal pools along the coast of California. Become familiar with the ecology of these and similar types of wetlands . . . . Also, be particularly aware of drought conditions that permit invasion of UPL species (even perennials)." (1989 Manual, *supra,* at pp. 55, 57.)

this concerted effort is presented on the attached Figure 1. Note that only a small portion of the total Kirkorowicz property is illustrated in Figure 1. This is the area which would be directly affected by project implementation, a small portion of the total Kirkorowicz property." Our review of the 1989 Manual convinces us that Scheidt's methodology comports with the Unified Federal Method for wetlands delineation, utilizing an onsite procedural wetland delineation method supplemented by disturbed area wetland determination procedures. (1989 Manual, *supra*, at pp. 21-22, 24-33, 50.)

Moreover, the 1989 Manual makes it clear that Scheidt considered dominance in obtaining his jurisdictional wetlands delineation, given his expressed reliance on the indicator status of certain wetland species. The determination regarding whether a species is dominant precedes an evaluation of a species' field indicator status (1989 Manual, *supra*, at pp. 9-10, 33, 34, 37, 43, 45), a fact the Kirkorowiczes' biologist impliedly acknowledged in his "Wetland Determination Report." There is no evidence Scheidt failed to properly follow the Unified Federal Method when identifying and delineating jurisdictional wetlands. Consequently, his expert opinion after personally surveying the site, his plant and animal species inventories and his site mapping provides substantial evidence the Kirkorowiczes' property at the site proposed for development involves jurisdictional wetlands.[17]

Emphasizing their property constitutes marginal degraded wetlands at best and is not designated as an environmentally sensitive habitat area (ESHA), the Kirkorowiczes argue it is of no environmental consequence and thus not worthy of protection. To the contrary, the Coastal Act by its definition of wetland (§ 30121) does not distinguish between wetlands according to their quality. Indeed, section 30233 limits development in all wetlands without reference to their quality. This is so because of the dramatic loss of over 90 percent of historical wetlands in California and their critical function in the ecosystem. Similarly, LUP Resource Management Element Policy 10.6 provides that there shall be no net loss of wetland acreage or resource value as a result of land use or development. In fact, the goal is to realize a net gain whenever possible. It further limits development in wetlands to four types of new uses, gives preference to developments that have no wetlands impacts, and, when a development unavoidably does cause a loss of wetlands, it requires creation of new wetlands at a greater than one-to-one ratio. None of these provisions distinguish between protecting high- and low-quality wetlands. Simply stated, in determining whether a wetland is protected under the Coastal Act and the LCP, the quality of the wetland is essentially legally irrelevant. As City's biologist Scheidt explained, "[a]ll wetland areas, even

---

[17]The Kirkorowiczes had ample opportunity to challenge Scheidt's methodology and findings both before the City and the Commission, but elected not to do so.

those in a heavily disturbed state, are considered significant biological resources in so far as they have a potential to buffer adjacent, higher quality areas. In this case, much higher quality wetland habitat is present to the south beyond the limits of the proposed site development area." The logic of this argument is apparent, for the failure to preserve and protect degraded or disturbed wetlands buffering adjacent higher quality wetlands will inevitably jeopardize, compromise and eventually erode the latter.

In *Bolsa Chica Land Trust v. Superior Court, supra*, 71 Cal.App.4th at pages 506-508, this court examined the issue of what development would be permitted in ESHA's. We found that the restrictions on development in section 30240 did not vary depending on whether the ESHA was in a threatened or deteriorating condition. Doubting that the Commission in deciding whether a particular area is an ESHA within the meaning of section 30107.5 may consider its viability, we stated: "There is simply no reference in section 30240 which can be interpreted as diminishing the level of protection an ESHA receives based on its viability. Rather, under the statutory scheme, ESHA's, whether they are pristine and growing or fouled and threatened, receive uniform treatment and protection." (*Bolsa Chica Land Trust v. Superior Court, supra*, 71 Cal.App.4th at p. 508.) The same reasoning applies here, as the statutory scheme protecting wetlands in this regard does not differ in any meaningful fashion from that protecting ESHA's. Finally, as we explained in *Bolsa*, the failure to protect the low-quality wetlands would encourage developers to find threats and hazards to all wetlands located in economically inconvenient locations. (*Ibid.*)

## DISPOSITION[18]

The judgment is reversed. The Commission is entitled to costs on appeal.

Kremer, P. J., and Nares, J., concurred.

---

[18]The Kirkorowiczes contend the trial court's decision can be upheld for the additional reason that the Commission conducted an unfair hearing on their CDP application. Although this issue was presented in their petition for writ of administrative mandamus below, the trial court never ruled on its merits. Casting aside the fact that the Kirkorowiczes did not file a protective cross-appeal, and we query whether the issue would be cognizable even under those circumstances, we elect not to address the contention in the first instance.

## APPENDIX

Figure 1. Wetland and Upland habitat areas - the Kirkorowicz property, Encinitas.

000868

Appendix A.